## UNITED STATES DISTRICT COURT
### DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION** 100 F Street, NE Washington, DC 20549-4030 Tel: (202) 551-4492 | : : : : |
| **Plaintiff,** | Case: 1:07-cv-01867 Assigned To : Bates, John D. Assign. Date : 10/17/2007 Description: General Civil |
| v. | : : |
| **URS KAMBER, STEPHAN HUSI, and RICHARD JON MAY,** | : : : |
| **Defendants.** | : : : |

## COMPLAINT FOR INJUNCTIVE RELIEF, DISGORGEMENT, PENALTIES AND OTHER RELIEF, FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND DEMAND FOR JURY TRIAL

Plaintiff United States Securities and Exchange Commission (the "Commission") alleges as follows against the Defendants named above:

### SUMMARY OF ALLEGATIONS

1.      This case arises out of a scheme perpetrated by the Defendants as officers and executives of Centerpulse Ltd. ("Centerpulse" or the "Company"), a former Swiss public company registered to trade American Depository Shares in the United States, fraudulently to misstate Centerpulse's financial results.

2.      In the third quarter of 2002, Centerpulse was finalizing critical debt financing needed to fund a $1 billion global settlement of numerous products liability lawsuits filed against the Company.  As part of this process, a consortium of banks were conducting due diligence of Centerpulse's financial results and condition.  Centerpulse gave the banks a set of budgets

containing forecasted financial results. In attempting to meet its forecasts, defendants Urs

Kamber (Centerpulse's Chief Financial Officer) and Stephan Husi (Centerpulse's Corporate

Controller) ordered Centerpulse's senior finance executives to release reserves, not record certain

expenses, and engage in other accounting improprieties.

      3.      Acting on these instructions, defendant Richard Jon May (Group Vice President

of Finance, Tax Counsel and Treasurer of Centerpulse USA Holding Company) and certain

Centerpulse vice presidents in the United States took numerous improper accounting actions,

which caused the Company to fraudulently overstate its third quarter earnings. Among other

things, these executives did not book certain losses and expenses, and improperly released

reserves to inflate the Company's third quarter operating and pretax income. May also

concealed the details of certain expenses from Centerpulse's outside auditors during the third

quarter. As a result of the Defendants' misconduct, Centerpulse fraudulently overstated its third

quarter pretax income by approximately $32 million, reporting $21.9 million in pretax income

instead of a $10.1 million loss.[1]

      4.      Kamber, Husi and May also engaged in accounting fraud in the fourth quarter of

2002 in order to close a shortfall in earnings so that Centerpulse's results would be in line with

earlier communications to the market, as well as the forecasted results the Company had given

the investment banks. In December 2002, Kamber told certain division-level finance executives

that their earnings forecasts for 2002 were too conservative, and he ordered them to do

everything possible to cover the earnings shortfall. Kamber, Husi and May improperly managed

Centerpulse's fourth quarter and annual earnings for 2002 by (a) not increasing the Company's

---

[1]     As a Swiss corporation, Centerpulse reported its financial results in Swiss francs ("CHF"), but also issued earnings releases and reports presenting its financial results in U.S. dollars. According to Centerpulse's 2002 annual report on Form 20-F, the average exchange rate from Swiss francs to U.S. dollars in 2002 was 1.55 Swiss francs per U.S. dollar (or 0.65 dollars per franc). All conversions from Swiss francs to U.S. dollars in this Complaint use this exchange rate.

reserve for expenses related to the settlement of a products liability class action by at least $18 million, and (b) improperly using certain anticipated refund credits to offset another $5 million in expenses related to the class action settlement. Kamber and Husi overstated Centerpulse's year-end 2002 assets in the additional amount of $3.4 million by refusing to write off costs associated with an impaired asset.

5.    As a result of these manipulations, Centerpulse's fourth quarter 2002 pretax income was fraudulently overstated by at least $26.4 million, reporting $141.9 million in income instead of $115.5 million, and its pretax income for fiscal year 2002 was overstated by the same amount, reporting $240 million in income instead of approximately $213.6 million.

6.    The Defendants' scheme to inflate Centerpulse's financial results materially overstated the Company's operating income, pretax income, expenses, assets and liabilities in public filings – specifically, its third quarter 2002 report on Form 6-K (furnished to the Commission on November 12, 2002), its fourth quarter 2002 financial results press release on Form 6-K (furnished to the Commission on March 28, 2003), and its 2002 annual report on Form 20-F (filed with the Commission on April 25, 2003).

7.    By committing the acts described in this Complaint, Kamber, Husi and May directly or indirectly engaged in and, unless restrained and enjoined by the Court, will continue to engage in, transactions, acts, practices and courses of business that violate Sections 10(b) and 13(b)(5) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Exchange Act Rules 10b-5 and 13b2-1 [17 C.F.R. §§ 240.10b-5 and 240.13b2-1]. May also violated Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2]. Husi and May aided and abetted violations of Exchange Act Section 10(b) and Rule 10b-5 by Kamber and the Company. Kamber, Husi and May aided and abetted the Company's violations of Exchange Act

Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) [15 U.S.C. §§ 78m(a), 78m(b)(2)(A) and

78m(b)(2)(B)] and Exchange Act Rules 12b-20, 13a-1 and 13a-16 [17 C.F.R. §§ 240.12b-20,

240.13a-1 and 240.13a-16].  Finally, Kamber violated Exchange Act Rule 13a-14 [17 C.F.R. §

240.13a-14] by signing a false certification contained in the Company's 2002 annual report filed

on Form 20-F.

8.     The Commission seeks a judgment from the Court:  (a) enjoining Defendants

from engaging in or aiding and abetting future violations of the federal securities laws named

above; (b) requiring them to disgorge, with prejudgment interest, all ill-gotten gains obtained as a

result of the accounting improprieties described in this Complaint, as well as from Centerpulse's

inflated financial results; (c) requiring them to pay civil money penalties pursuant to Exchange

Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; and (d) barring them from acting as officers or

directors of a public company pursuant to Exchange Act Section 21(d)(2) [15 U.S.C. §

78u(d)(2)].

## JURISDICTION AND VENUE

9.     The Court has jurisdiction over this action pursuant to Exchange Act Sections

21(d), 21(e) and 27 [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].  The Defendants made use of the

means or instruments of interstate commerce, of the mails, or of the facilities of a national

securities exchange in connection with their acts, transactions, practices and courses of business

alleged in this Complaint.

10.     Venue lies in the District of Columbia pursuant to Exchange Act Section 27

because Centerpulse furnished and filed materially false and misleading reports on Forms 6-K

and 20-F with the Commission in this District.

## THE PARTIES

11.     The plaintiff is the United States Securities and Exchange Commission, which

brings this action pursuant to the authority conferred on it by Exchange Act Sections 21(d) and

21(e).

12.     Defendant Urs Kamber, age 55, is a Swiss citizen who lives in Herbligen,

Switzerland. He was the Chief Financial Officer of Centerpulse from September 2001 through

October 2003. He certified the accuracy of the Company's financial results contained in its third

quarter 2002 report on Form 6-K, in its fourth quarter 2002 financial results press release on

Form 6-K, and in its 2002 annual report on Form 20-F. He is a Chartered Accountant in

Switzerland and was so while he worked at the Company. He is currently the Chief Financial

Officer of Pendragon Medical Ltd., a private Swiss medical devices company, and the Chief

Executive Officer of InCentive Private Equity Group AG in Zurich, Switzerland.

13.     Defendant Stephan Husi, age unknown, is a Swiss citizen who lives in Zurich,

Switzerland. He was the Corporate Controller of Centerpulse from early 2002 through October

2003.

14.     Defendant Richard Jon May, age 42, is a U.S. citizen who lives in Fort Wayne,

Indiana. He was the Group Vice President of Finance, Tax Counsel and Treasurer of

Centerpulse USA Holding Company from 2001 through October 2003. He is a Certified Public

Accountant and an attorney, licensed and admitted to practice in Texas, and was so while he

worked at Centerpulse. He is currently Vice President of Tax and Treasury, as well as Tax

Counsel, for Zimmer Holdings, Inc., the company that acquired Centerpulse in October 2003.

## FACTS

15.     Originally named Sulzer Medica AG, Centerpulse was a publicly-traded corporation headquartered in Switzerland that manufactured a variety of medical devices, including hip and knee implants. From January 2001 through October 2003, the Company's American Depository Shares were registered in the United States pursuant to Exchange Act Section 12(b) [15 U.S.C. § 78l] and were traded on the New York Stock Exchange under the symbol "CEP." As a foreign issuer, Centerpulse filed annual reports with the Commission on Form 20-F and furnished quarterly reports and other filings on Form 6-K. In its 2002 annual report on Form 20-F, the Company represented that its financial statements were prepared in conformance with International Financial Reporting Standards ("IFRS") and reconciled to Generally Accepted Accounting Principles in the United States ("U.S. GAAP"). It was also the Company's policy and practice to maintain the books and records of its U.S. divisions in accordance with U.S. GAAP. Centerpulse's fiscal year ended on December 31 of each calendar year.

16.     Between 2001 and 2003, Centerpulse's financial statements were audited by PricewaterhouseCoopers AG ("PwC-AG"), an international accounting and consulting firm and one of the member firms of PricewaterhouseCoopers International Ltd. PricewaterhouseCoopers LLP ("PwC-US"), a public accounting and consulting firm in the United States, performed certain audit procedures and examination functions in connection with the annual audits and reviews of Centerpulse's financial statements.

## I.     KAMBER ORDERED EXECUTIVES TO ESTABLISH RESERVES AGGRESSIVELY AND TAKE EXPENSES IN 2001

17.     On December 5, 2000, Centerpulse's U.S. Orthopedics Division announced a voluntary recall of certain lots of a medical implant that failed to adhere to patients after surgery.

Centerpulse later announced a similar defect with a second medical implant. The Company was sued in over 1,980 products liability and personal injury lawsuits in the United States and Canada. The lawsuits were eventually consolidated. As a result of this recall litigation, the Company suffered negative media coverage and experienced significant turnover in its senior management, including its Chief Executive Officer and Chief Financial Officer.

18.     In 2001, Centerpulse reached a tentative settlement agreement to resolve the recall litigation and recorded a reserve of $783 million (the "Recall Reserve") in its financial statements as an initial estimate of its exposure. At the end of 2001, new management increased the Recall Reserve to $873 million. At this time, Defendant Urs Kamber, the Company's new Chief Financial Officer, instructed Centerpulse's finance executives to be aggressive in establishing reserves, to write down asset impairments, and recognize additional expenses in 2001. Kamber indicated that the finance executives should recognize as many losses as possible in 2001, and that he would not accept any write-offs in 2002 that could have been taken in 2001.

19.     On May 8, 2002, the court presiding over the recall litigation approved the final settlement agreement that Centerpulse had negotiated with the plaintiff class. The agreement established a trust of approximately $1.1 billion from which money would be paid to compensate claimants. Centerpulse agreed to contribute $725 million to the trust, $635 million of which was to be funded by a credit facility that the Company sought from a consortium of banks.

## II.     THE DEFENDANTS ENGAGED IN FRAUDULENT ACCOUNTING TO INFLATE CENTERPULSE'S THIRD QUARTER 2002 INCOME

20.     Centerpulse negotiated the terms of the $635 million credit facility during the third quarter of 2002. As part of that process, Centerpulse gave the banks a set of budgets containing forecasted financial results for each quarter of 2002 as well as several years going forward. The preliminary third quarter results, however, came in worse than expected, and

Kamber and Husi worried that Centerpulse would not be able to meet its forecasts. During the course of the quarter, Kamber and Husi directed the Company's senior finance executives to release reserves, not record certain expenses, and engage in other accounting practices in ways that they knew or were reckless in not knowing were improper. Acting on these instructions, May and other Centerpulse officers took improper accounting actions, which had the cumulative effect of increasing the Company's third quarter 2002 pretax income from a $10.1 million loss to $21.9 million in positive pretax income – a total overstatement of approximately $32 million.

A.    **The Defendants Improperly Delayed Recognition of a $25 Million Expense**

21.    Kamber, Husi and May did not record a $25 million expense incurred in the third quarter of 2002, at the latest, for attorneys' fees arising from the recall litigation settlement. Instead, they improperly delayed recognition of the expense until the fourth quarter in order to inflate third quarter income.

22.    In 2001, Centerpulse agreed to pay Richard Scruggs, a class action attorney, $20 million to help the Company settle the recall litigation. In April and May 2002, Scruggs disputed the fee arrangement. Centerpulse agreed to increase the fee by an additional $25 million. At the beginning of Centerpulse's fiscal third quarter, between July 2 and 8, 2002, Centerpulse's Board of Directors executed a unanimous consent resolution approving payment of the full $45 million "for legal services provided by the Scruggs Law Firm."

23.    Accrual accounting is required under both U.S. GAAP and IFRS. The accrual method of accounting is based on recognizing financial transactions and events as they occur instead of when cash is paid. In this case, the Company incurred the $25 million expense for additional attorneys' fees at least by the time the Board approved the expense in July 2002, if not before, and therefore the expense should have been recognized by the third quarter of 2002.

24.     Kamber, however, did not want to recognize the expense in the third quarter, and he sought advice on how to avoid doing so. On July 4, 2002, he received an e-mail from an undisclosed party,[2] who advised him that "the approval should wait a bit" in order to "realize our idea to not include this payment in the income statement." However, the Board was already circulating and signing the unanimous consent resolution approving the payment. Therefore, despite Kamber's plans, the $25 million additional expense was incurred and should have been recognized in the third quarter.

25.     Kamber, Husi and May realized that the $25 million expense would lower Centerpulse's third quarter income and could impede the Company's effort to obtain the debt financing needed to fund the recall litigation settlement. Therefore, despite knowing that the $25 million expense had been incurred in the third quarter, Kamber, Husi and, ultimately, May improperly decided to delay recognition of the expense by arranging to pay the additional attorneys' fees in the fourth quarter and to record the expense after payment had been made.

26.     On or around July 17, 2002, Kamber sent Scruggs an agreement, signed by Kamber and Centerpulse's Chief Executive Officer, memorializing the obligation to pay an additional $25 million for Scruggs' representation in the recall litigation and specifying that the amount would be paid in two installments in the fourth quarter of 2002.

27.     May made the payment arrangements and directed the accounting entries in Centerpulse's books and records. On September 5, 2002, he received an e-mail from the Company's Treasurer explaining that $15 million would be paid on October 1, 2002 and $10 million on November 4, 2002. On the same day, May instructed a subordinate to prepare two wire requests for the payments. He then e-mailed an attorney associated with the Scruggs Law

---

[2]     When Centerpulse produced this e-mail to the Commission, the Company redacted the name of the person who sent it, apparently in an effort to comply with Swiss privacy laws. A number of documents produced by the Company were redacted similarly.

Firm "confirming that the wire instructions for the additional funds owed Scruggs have not changed." On or around September 10, 2002, May signed two check requests approving the wire transfers and directing that they be made on October 1 and November 4, 2002.

28.    On September 30, 2002, May sent an e-mail to Kamber and the Treasurer of Centerpulse confirming that the Company would make the $15 million wire transfer to Scruggs the next day. Accordingly, on October 1 – the first day of the fourth quarter – the Company made the first transfer. Centerpulse made the other, $10 million transfer on November 4, 2002. May sent an e-mail to an attorney with the Scruggs Law Firm confirming that the $10 million wire transfer had been made.

29.    Although May made arrangements to pay the additional fees in the fourth quarter, he nevertheless told Kamber and Husi that the expense needed to be recognized in the third quarter, and he accordingly asked for permission to increase the Recall Reserve in the third quarter, which would have decreased the Company's third quarter income. Because Kamber did not want the expense to harm the Company's third quarter results, he ordered May not to increase the Recall Reserve, as described below.

30.    On or around September 18, 2002, Centerpulse's Treasurer included the Scruggs fees as an extraordinary expense in a projected cash flow chart provided to the Company's prospective lenders. On the evening of September 18, 2002, May sent Kamber an e-mail advising him that the lenders were now aware of the expense and that Kamber should "consider whether it would be clearer to reflect the $25M in the settlement reserve ...."

31.    Kamber did not want to increase the Recall Reserve because he was worried that Centerpulse's lenders would become concerned that the Company had not established adequate reserves for its liabilities surrounding the class action settlement. Accordingly, on September 19,

2002 Kamber responded to May, "In theory yes, however, how do you want to camouflage". In his reply (which was also sent to Husi), May proposed some ideas for accounting for the expense, including a proposal falsely to classify the payments as part of a divestiture of certain Centerpulse assets. In the same message, however, May also made clear that the expense should be recognized in the third quarter:

> "In any regard, we are likely faced with the issue for the Q3 closing--if the contingency for these payments has cleared such that accruing them makes sense, it would seem like we will be faced with a revision to the settlement reserve."

32.     May made the same point again on October 18, 2002, when he sent an e-mail to Kamber and Husi asking whether the additional fees should be reflected in the Recall Reserve for the third quarter:

> "How do you want to handle the recall provision for Q3?  I would think we might want to revise the number for potentially ... Addl Scrugg's payments."

Kamber refused to account for the $25 million expense in the third quarter, or to include it in the Recall Reserve as part of the class action settlement.  Despite being informed by May of the proper accounting treatment, Kamber made clear that he did not want the fees recognized in the third quarter. On October 19, 2002, he replied:  "I do not want to adjust anything in the 3rd quarter.  We will make additional adjustments at year-end."

33.     May responded that the Recall Reserve was materially understated and implied that Kamber's decision could lead to charges of accounting fraud:

> "While I understand your desire and it's ultimately your decision, I have a tough time understanding how we can not revise the provision.  I may not have all the facts and am certainly not privy to all the recent events, but from my position our recall provision is materially understated given what I know (or think I know).  I have never been clear on what our obligations are in revising revisions for quarterly releases--but given the recent uproar

in the US over accounting issues you can certainly understand my· uneasiness about the recall reserve...."

34.     Despite knowing that their accounting for the Scruggs fees was improper, the Defendants chose not to appropriately recognize the additional fees in the third quarter. May instead recorded the $25 million expense in Centerpulse's fourth quarter books with Kamber and Husi's knowledge and consent.

35.     The Defendants' decision to recognize the $25 million expense in the fourth quarter was improper because, in doing so, the Defendants knowingly or recklessly rejected accrual-based accounting principles – recognized in U.S. GAAP, IFRS and the Company's accounting policy – which require that an expense must be recognized when it is incurred, not when it is paid. Further, Statement of Financial Accounting Standards No. 5 ("FAS 5"), *Accounting for Contingencies*, requires a company to reserve for losses when they are probable and estimable. The $25 million expense was probable and estimable by no later than July 2002, and therefore should have been recorded by no later than the third quarter. The Defendants knew or were reckless in not knowing that their decision to improperly delay recognition of the expense until the fourth quarter inflated and misstated the Company's reported third quarter 2002 income.

36.     May perpetuated the fraud by withholding material information from PwC-US about the Scruggs fees. Among other things, May did not tell the auditors that the $25 million expense was incurred and should have been recognized by the third quarter. He also kept the expense out of a series of projected cash flow schedules he provided to the banks and the outside auditors between July and September 2002. Instead, he waited until the fourth quarter to inform the auditors of the fees. May knew this delay was wrong and warned Kamber as early as July

19, 2002 that Centerpulse's outside auditors might require the Company to restate its financial results if they learned the details behind the additional Scruggs fees.

37.    Ultimately, that is what happened. In December 2003, after Kamber and Husi had left the Company, Centerpulse restated its previously filed false financial statements and moved the additional Scruggs fees to the third quarter of 2002. If Kamber, Husi and May had properly recognized and recorded the additional Scruggs fees, the Company would have reported a $3 million pretax loss for the third quarter instead of $21.9 in pretax income.

**B.    Kamber and Husi Did Not Write Off**
**$3.4 Million in Costs for an Impaired Asset**

38.    In early 2002, Kamber and Husi knew that Centerpulse's European Orthopedics Division had abandoned a project to develop a proprietary "Global Supply Chain" software system, which was to be used to track the Company's inventory. Consequently, the European portion of the system was an impaired asset that should have been written off because the underlying software had no value after the project was abandoned. Despite being informed that proper accounting required them to be written off, Kamber and Husi decided to continue carrying $3.4 million of costs incurred in the project on the Company's books as an asset through the end of the third quarter because a write-off would have reduced third quarter pretax income by nearly 16 percent. To hide the fact that the costs were impaired assets in the European Orthopedics Division, the Company improperly kept them on the books of its U.S. Orthopedics Division.

39.    In April 2002, Kamber learned that the European Orthopedics Division had stopped participating in the Global Supply Chain project, causing a $3.4 million impairment of software modules that were part of the program. He also learned that the U.S. Orthopedics

Division had not written off these costs at year-end 2001. He accordingly fired the Division's

Vice President of Finance and promoted a new person to that position (the "Orthopedics VP").

40.    In the summer and fall of 2002, the Orthopedics VP repeatedly informed Husi and

others that the Global Supply Chain costs were being carried improperly on the books of the U.S.

Orthopedics Division and should be written off because the asset was impaired. For example, on

July 23, 2002, the Orthopedics VP sent Husi and another Centerpulse employee an e-mail stating

that:

> "SOUS[3] has an asset on our books for the Supply Chain project.
> Originally, this project involved SOAG as well. However, during Q1
> 2002, SOAG chose not to participate in the project any longer. SOUS had
> incurred approximately $3.5 mil related to the SOAG participation
> through this time. Now that SOAG will no longer participate, the asset
> value is over stated or impaired by this amount. The centralized services
> fixed asset accountant has indicated that Urs [Kamber] did not want to
> write this off. However, per U.S. GAAP we should write the asset down if
> it is impaired…."

41.    In an August 20, 2002 e-mail forwarded to Husi, an employee of the European

Orthopedics Division described the improperly carried Global Supply Chain project costs as a

"sword of Damocles" that had been hanging over Centerpulse for a long time. The employee

noted that the U.S. Orthopedics Division intended to write off the asset, and on August 27, 2002

he asked for permission to record an expense to reflect the impairment:

> "The project stop of the European part of the 'Global Supply Chain'
> project has resulted in the immediate write-off of the licenses released for
> the European users and the corresponding development work by PWC.
> The amount written off is calculated at approx. USD 3.4 million, i.e. CHF
> 5.1 million and is documented in detail. SOUS, which previously bore all
> costs and capitalized the investments, will bill us accordingly in
> September and write off the investment in their books. At SOAG, we

---

[3]    "SOUS" was the acronym that Centerpulse employees used to refer to the U.S. Orthopedics Division. The initials stood for "Sulzer Orthopedics U.S." and originated when Centerpulse was named Sulzer Medica. "SOAG" was the acronym for the European Orthopedics Division, standing for Sulzer Orthopedics AG. After Sulzer Medica changed its name to Centerpulse, company personnel also used the terms "COUS" and "COAG" to refer to the U.S. and European Orthopedics Divisions, respectively.

want to report this amount starting in Q3 **as an extraordinary expense,** just like we reported the write-offs on the discontinued Global Data Warehouse project at the end of 2001.... Is that OK with you?" [Emphasis in original].

42.    Husi replied on August 28, 2002 that "I have to discuss this with Urs Kamber. No 'exceptionals' in 2002 directives have applied so far. But I also see the logic for posting under 'exceptionals.'"

43.    That same day, a U.S. Orthopedics Division accounting employee sent another e-mail to the Orthopedics VP, Husi and others, stating that Centerpulse should write off the $3.4 million in costs and asking for permission to accrue the expense:

> "I have kept 3.4 mil as CIP and have not written off in SOUS book. My concern is that either SOUS or SOAG needs to show 3.4 mil as a write off.... [D]o you want me to accrue it as write off in Aug-02 until the decision is made?"

44.    In response to this, Husi sent the Orthopedics VP an e-mail stating that "SOUS should not consider any write offs in August. As mentioned below I will have to agree with Urs [Kamber] on how to handle it." The Orthopedics VP then sent an e-mail to the requesting employee instructing her not to write off the costs.

45.    On September 23, 2002, the Orthopedics VP sent Husi another e-mail revisiting the issue, expressing frustration with the decision of Kamber and Husi, and stating that the costs should not be kept on the U.S. Division's books:

> "There seems to be reluctance to proceed with the transfer of the SOAG portion of the Supply Chain asset from SOUS to SOAG. You had emailed me prior to your holiday that we should not do it in August, however, I have not heard the reason why. For the Estimate 2002 portion of the 2003 Budget process, SOUS is showing the asset as being transferred to SOAG. This is the proper thing to do, as the funds were spent in Switzerland on the SOAG portion of the project at the time, the project plan called for the transfer, and the decision to abandon the project was made at SOAG. The costs were simply managed from one location (SOUS) for control purposes. It is clear that this item belongs on SOAG's books and not

SOUS! It is impacting SOUS business metrics (operating assets, RONA) which are part of our bonus calculation."

46.    Later that day, the Orthopedics VP participated in a conference call concerning the Global Supply Chain project, during which Kamber and Husi ordered him to keep the costs improperly reflected on his books as an asset. That order was repeated and amplified the next day. On September 24, 2002, a Centerpulse executive in Switzerland sent an e-mail to the Orthopedics VP, Husi and others stating that, per Husi's directive, the Global Supply Chain project costs would not be written off:

"With regards to our conference call from this afternoon I have had an additional discussion with Stephan Husi later. He told me to communicate to you the following:

-    it is not the intention of Cooporate [sic] to show this potential write off in the actual Estimate 2002
-    transactions in connection with this case should be kept at a minimum
-    therefore the asset stays in the SOUS books for the moment (September Closing as well as Estimate 2002 – see also original message below). No write off is being booked against this asset.
-    this does not mean that SOAG is not taking over the position as well as the corresponding write off by the end of the year.
-    Stephan Husi and Mr Kamber will decide in October 2002 per when the assets is [sic] going to be taken over and written off by SOAG
-    SOAG is mentioning and explaining the story behind this in its estimate-narratives (SOUS can do so as well)
-    wheather [sic] Stephan [Husi] mentions this in his consolidated narratives or not is up to his decision."

47.    The Orthopedics VP did not write off the $3.4 million in costs in the third quarter of 2002.

48.    Kamber and Husi knew or were reckless in not knowing that their order to not write off the $3.4 million in costs was improper. Centerpulse should have written off the costs because the European Orthopedics Division had abandoned the project and the underlying software developed for the project therefore had no value. In ordering the costs to remain on

Centerpulse's books as an asset, Kamber and Husi knowingly or recklessly rejected U.S. GAAP, IFRS and the Company's accounting policy. Under U.S. GAAP, AICPA Statement of Position 98-1, *Accounting for the Costs of Computer Software Developed or Obtained for Internal Use*, requires that computer software "should be reported at the lower of the carrying amount or fair value, if any, less costs to sell" when it is no longer probable that the asset is being developed – that is, when it is no longer reasonable to believe that the software will be completed and placed in service. IFRS similarly requires that assets be carried at no more than their recoverable amounts. Specifically, International Accounting Standard ("IAS") No. 36, *Impairment of Assets*, requires that internally generated intangible assets, such as computer software, be assessed for impairment, which occurs when "the carrying amount of the asset exceeds its recoverable amount."

49.    Centerpulse failed to recognize an impairment loss for the European portion of the Global Supply Chain project, which was no longer of value to the Company. Kamber and Husi were repeatedly made aware that their decision to keep these costs on Centerpulse's books as an asset was improper accounting. Kamber and Husi also knew or were reckless in not knowing that their decision not to take an impairment charge inflated and misstated third quarter 2002 income.

50.    Because Kamber and Husi improperly decided not to write off the Global Supply Chain project costs in the third quarter of 2002, Centerpulse's third quarter pretax income was overstated by $3.4 million, over 18 percent.

C.    **The Defendants Approved an Improper $2.4 Million Reserve Release**

51.    Centerpulse's SpineTech Division determined that, between 1997 and 2001, it was not in compliance with state laws governing the collection and remittance of sales, use and property taxes to various jurisdictions. At year-end 2001, May and employees in the SpineTech

Division increased the reserve covering this tax exposure from $200,000 to approximately $6 million, which was the low end of the estimated range of liability.

52.    In July 2002, the SpineTech Division had retained Deloitte & Touche ("Deloitte") to review the Division's sales, use and property tax exposure. Deloitte informed the SpineTech Division's Vice President of Finance (the "SpineTech VP") and others that the Division lacked required sales tax exemption certificates in 49 U.S. states. As a result, the Division was at risk of incurring full tax exposure in these states, plus penalties and interest. On August 2, 2002, Deloitte estimated that the Division's likely tax exposure was approximately $6.25 million, plus penalties and interest. Accordingly, the Division increased the reserve to over $6.4 million.

53.    Around the same time, Kamber and others learned that the SpineTech Division's sales for August 2002 were going to miss forecasts by approximately $2.8 million. Kamber told a SpineTech Division employee that the sales result was "not very satisfactory." The Division's staff reviewed the sales, use and property tax reserve during September 2002 to determine whether it could be lowered. On or around September 17, 2002, the SpineTech VP directed her staff to release over $2.4 million from the reserve into income, taking the reserve down to exactly $4 million. The release had no documentation or support, and it was well below estimates of the Division's potential tax liability. On September 16, 2002, May wrote an email to the SpineTech VP stating that "I do not think we can or want to reverse any of it yet-we should revisit this at yearend—but for now ... we still have the full exposure (or most of it anyway)."

54.    After the release was made, Kamber and Husi were made aware that it had improved the SpineTech Division's results. On September 17, 2002, Husi was informed by e-mail that the release "is being posted to extraordinary gain." On September 22, 2002, Kamber

received an e-mail stating that the Division had recorded the release for August 2002 as a change to its earlier reported results. The e-mail Kamber received explained that the release had increased quarterly earnings and partially compensated for the disappointing results caused by August's poor sales figures.

55.    Kamber, Husi and May knew or were reckless in not knowing that it was improper under U.S. GAAP, IFRS, and the Company's accounting policy for Centerpulse to release over $2.4 million from the SpineTech Division's sales, use and property tax reserve in the third quarter because there was no documentation or support for reducing the reserve to $4 million, and May explicitly stated that the Company's exposure still required the full reserve amount. The release was improperly made to improve the Company's third quarter results. Because of the improper release, Centerpulse's third quarter pretax income was overstated by $2.4 million, or 12 percent. The Defendants knew or were reckless in not knowing that the release inflated and misstated third quarter 2002 income.

### D.    Kamber and Husi Ordered False Journal Entries Artificially to Inflate the Dental Division's Income by Over $1.2 Million

56.    In 2001, Centerpulse's outside auditors observed that the Company was not recording variances on a monthly basis at its Dental Division for the difference between standard and actual costs associated with purchase prices, labor and overhead. In response, Company management agreed that going forward the Dental Division would record such variances each month in accordance with the correct accounting treatment. However, in the first half of 2002, Division finance employees did not consistently record manufacturing and inventory variances in this manner.

57.    In June 2002, the Dental Division's newly appointed Vice President of Finance (the "Dental VP") recognized that inventory variances had not been recorded regularly during

the first six months of the year. He directed that such variances be recorded monthly going forward. Pursuant to his instructions, the Dental Division's accounting staff made journal entries for variances in June, July and August 2002, with accompanying support and analyses. These adjustments increased the Dental Division's inventory revaluation reserve by approximately $1.2 million, which reduced the Division's third quarter income by the same amount.

58.    On October 17, 2002, Kamber sent the Dental VP and Husi an e-mail stating that the reserve build up was unacceptable because it had eroded the Dental Division's profitability and could harm the Company's ability to obtain the debt financing it needed:

> "I have been going through the numbers for the third quarter this year with Stephan Husi. When analyzing the Dental numbers very strange things appear. Sales rose as we expected at almost 20% where as the profitability has decreased y.o.y. Stephan [Husi] informed me that this is due to 'special' adjustments in inventory and other things in the month of September.
>
> . . . . [T]his is not acceptable at this time. I cannot show a decreasing profitability while the revenue increased at 20%. In theory, your Gross Profit and bottom line should go through the roof. We will all be in deep problems, if I present this to the banks which give [sic] me $635 million to pay the [recall] settlement.
>
> I ask you to immediately contact Stephan Husi and go through item by item of what was booked. I cannot accept any reserves building, revaluation of inventory etc. at this point. This has to be postponed to December."

59.    A few hours later, Husi sent an e-mail to the Dental VP and others stating that the "correction" requested by Kamber "must happen today." After receiving these e-mails, the Dental VP called Husi, who ordered him to release $1 million from the inventory revaluation reserve into income. The Dental VP then ordered his subordinates to do so over their objections. There was no documentation or support for the release.

60.    Kamber and Husi knew or were reckless in not knowing that the release they ordered did not conform with U.S. GAAP, IFRS or Centerpulse's accounting policy. Earlier in the third quarter, the Dental VP had learned that Dental Division staff had not accounted for inventory cost variances and properly increased the inventory revaluation reserve after determining that it was inadequate. The release Kamber and Husi ordered was improper because it was made without support or sound accounting basis, and because they knew or were reckless in not knowing that the Dental VP's analysis determined that the reserve needed to be increased.

61.    Also during the third quarter of 2002, Kamber and Husi ordered the Dental VP to reverse $215,000 from a Dental Division reserve for sales and retention bonuses. Their purported reason for doing so was that the bonuses should be recorded in the period when they would be paid, not in the period earned. However, this order was improper. Kamber and Husi knowingly or recklessly rejected accrual-based accounting principles – recognized in U.S. GAAP, IFRS and Centerpulse's accounting policy – which require that an expense be recognized when it is incurred, not paid. In this case, Kamber and Husi knew that the bonus expenses related to activities occurring in the third quarter of 2002 and were therefore incurred in the third quarter.

62.    The improper release of $1,215,000 from the Dental Division's reserves caused Centerpulse's third quarter pretax income to be overstated by over 5 percent. Kamber and Husi knew or were reckless in not knowing that the releases made at their direction inflated and misstated the Company's third quarter 2002 income.

E.    **The Defendants' Fraudulent Accounting Inflated Centerpulse's**
       **Third Quarter 2002 Pretax Income by Approximately $32 Million**

63.    On November 12, 2002, Centerpulse furnished its third quarter 2002 report to the

Commission on Form 6-K.  The report fraudulently misstated that Centerpulse earned

approximately $21.9 million in pretax income for the quarter.  If the Defendants had not

knowingly or recklessly engaged in the fraudulent accounting manipulations described above,

Centerpulse would have posted a pretax loss of approximately $10.1 million.

64.    As Kamber repeatedly made clear, such a result would have been disastrous to the

Company's effort to obtain debt financing so that it could settle the recall litigation.  The

Defendants therefore knowingly or recklessly directed, facilitated and approved the accounting

manipulations described above in order to fraudulently boost the Company's quarterly earnings

by approximately $32 million.

III.    **THE DEFENDANTS ENGAGED IN FRAUDULENT ACCOUNTING**
        **TO INFLATE CENTERPULSE'S YEAR-END 2002 INCOME**

65.    The Defendants manipulated Centerpulse's accounting for the fourth quarter of

2002 to counter disappointing results.  On November 22, 2002, Husi sent an e-mail to Kamber

and the Company's divisional finance executives alerting them that an internal forecast predicted

that the Company would miss its 2002 EBITDA target by $13 million to $16 million.[4]  As Husi

described the situation, "[t]he estimate indicates that CEP has a substantial EBITDA gap to close

to be in line with earlier communications (approx. 20-25 MCHF)."[5]  Husi then issued directions

to "improve the result."  Specifically, he directed the finance executives to "stop/delay to 2003

---

[4]    Centerpulse used its "earnings before income taxes, depreciation and goodwill amortization" ("EBITDA")
as a measure of its profitability.

[5]    "MCHF" is an abbreviation that stands for millions of Swiss francs.

all expenses that still can be influenced," and that they were to take "no reserves that are 'nice to have,' no additional write downs, etc."

66.    Kamber, Husi, May and other Centerpulse senior executives participated in a conference call on December 12, 2002 to discuss the Company's expected results. Meeting minutes show that the Defendants again discussed the EBITDA gap:

> "According to the [business units'] numbers, there are about 23 MCHF missing in revenue and 20 MCHF missing in EBITDA to meet the number we told the banks for 2002. If this should be true, we would have to issue a profit warning. [Centerpulse's CEO] will never accept this. [Business unit] controllers have to go through the forecasts as they were to [sic] conservative. If there is room to cover the EBITDA gap, they must do everything possible to cover it."

67.    In order to close the EBITDA gap and improve the Company's results, Kamber and Husi again ordered May and others to take improper accounting actions. Specifically, the Defendants decided not to increase the Recall Reserve to account for at least $18 million in probable and estimable liabilities associated with the recall litigation settlement. They improperly used approximately $5 million in anticipated refund credits in the recall litigation to offset litigation expenses charged against the Recall Reserve. Finally, Kamber and Husi caused Centerpulse's 2002 assets to be overstated by $3.4 million by refusing to write off costs for an impaired asset.

### A.    The Defendants Improperly Refused to Increase the Recall Reserve As Needed to Cover Losses Incurred in the Recall Litigation

68.    On January 23, 2003 (weeks after the end of fiscal year 2002), May told Kamber, Husi and others that the Recall Reserve was understated for fiscal year 2002 and needed to be increased to cover Centerpulse's obligations under the recall litigation settlement. In all, May listed about $78 million in additional, previously unreserved, liabilities that he thought needed to be added to the Recall Reserve for year-end 2002 to create a reserve that was "conservative but

realistic, with little chance of additional reserves later on ...." May also pointed out that there

was a serious need to raise the Recall Reserve because it was almost out of money:

> "What has to be realized is that the total cash paid on the recall to date has
> been $861.5M ($865.3M less $3.8M inv[entory] obs[olescence] reserve)--
> so this would leave only $11.9M left as reserve if the original $873.4M
> calculation was still valid. This would not even be enough to cover the
> remaining opt-outs--so an adjustment is needed."

69.     The next day, Kamber reacted angrily:

> "This is crazy!! We will get killed with this. Will call you today, but
> please be prepared to fly over here next week."

70.     Later the same day, Husi sent an e-mail to May and Kamber making it clear that

Centerpulse would not increase the Recall Reserve, as May believed was necessary. Instead,

Husi and Kamber ordered May to keep the Recall Reserve under an arbitrary ceiling:

> "Urs wants to discuss this on Monday.... The goal must be to
> substantially reduce the accruals proposed by you. The total recall
> expenses should not exceed 900 m (vs 950 m proposed). We must
> together find an argumentation to get there."

May replied to Husi and Kamber, "I am not a miracle worker."

71.     Nevertheless, by January 27, 2003, May had reworked his analysis of the Recall

Reserve so that it showed a required increase of only $858,000, as opposed to the $78 million

increase he said was needed four days earlier. In doing so, May acted contrary to U.S. GAAP by

simply removing probable and estimable liabilities from his calculation. In particular, May's

adjustments included improperly removing $10 million in losses associated with 125 revision

surgeries, so-called "miscounts," which were covered by the recall litigation settlement but had

been missed by the Company in earlier estimates of its liability. The adjustments also included

anticipated refund credits related to various settlement payments to offset approximately $5

million in additional litigation-related costs. According to May, these and other adjustments

brought the Recall Reserve down over $34 million below his own "best case" estimate of the Company's liability.

72.    Kamber and Husi approved only the $858,000 in accounting adjustments that May proposed, which were then recorded in Centerpulse's books and records for fiscal year 2002. The Defendants knew or were reckless in not knowing that their actions were improper because they had purposefully set the level of the Recall Reserve for year-end 2002 substantially below the best case estimate of the Company's liability. They also knew they were improperly keeping the Recall Reserve low to improve the Company's fourth quarter 2002 earnings.

73.    The Defendants' improper accounting enabled them to make fraudulent public statements. On February 6, 2003, Centerpulse announced its total annual sales results for 2002 in a press release and reiterated that it expected its 2002 net profit to at least match its 2000 net profit of CHF 190 million, or $124 million. If the Defendants had increased the Recall Reserve as called for by their own liability estimates, the Company would not have been able to meet its profit projections.

74.    The Defendants misled Centerpulse's outside auditors about the Recall Reserve. On January 27, 2003, May told Kamber and Husi that he had "cleaned up" the files on the Recall Reserve he intended to give to PwC-US. The next day, Kamber and Husi approved May's improper liability analysis and told him that he could forward it to PwC-US. The "cleaned up" files, provided as support for the audit of the Company's fiscal year 2002 results, misled Centerpulse's outside auditors because they omitted probable and estimable liabilities arising from the recall litigation.

75.    Then, on February 18, 2003, May again misled Centerpulse's outside auditors by signing a series of management representation letters, given to support the fiscal year 2002 audit, stating that the Recall Reserve was adequate for the Company's remaining exposure:

> "During 2001, the Company recorded a provision of approximately $873 million related to the InterOp recall and tibia baseplate knee withdrawal. Through December 31, 2002 the Company has made payments (including its funding of the settlement trust) of approximately $841 million (net of $31 million in reimbursements received from Winterthur Insurance) against the reserve, leaving an accrual for approximately $32 million at December 31, 2002 for remaining exposures. . . . Based on information known as of now, we believe the remaining reserve of $32 million is adequate for the remaining exposure related to the InterOp recall and tibia baseplate knee withdrawal."

76.    Kamber and May refused to increase the Recall Reserve or notify the Company's outside auditors, even as other liabilities, amounting to approximately $8 million, came to their attention. On February 21, 2003, just three days after signing representation letters to the Company's outside auditors, May once again expressed concerns about the Recall Reserve because Kamber told a potential acquirer (codenamed "Safari") that the reserve was understated for so-called "reprocessed shell" surgeries:

> "What I was trying to do was to compare the information we presented to PWC for yearend purposes to what was told Safari. Basically, I got concerned based on the presentation that we are under-reserved-- particularly in light of the estimate for reprocessed shells....
>
> ... I estimate that we are under-reserved by over $8.3 million--in other words, our yearend reserve balance should not be $31.4M--it should be $39.7M. Basically, this is all attributable to reprocessed revisions. I only had 109 considered in my reserve--you now have increased this to a low end 148 if I heard the number correctly (this is one of those areas that apparently changed from the version I had, which showed 164)....
>
> Now, I am not sure how much 'cushion' might be in the number of reprocessed revision claims, but if our goal in that meeting with Safari was to present reasonable best case revision numbers--I have a difficult time finding a way to justify my calculation of 109 (admittedly a risk area in

> the reserve calcs we gave PWC from the start--which I told them so)
> which was used in the PWC calculation...."

May expressed concern that his representations to Centerpulse's outside auditors were untrue:

> "My concern is that I am not [sic][6] more uncomfortable with the
> representation I made in the PWC Management Rep letter. In that rep, I
> represented that the remaining reserve of $31.4M was adequate--I now
> have some doubts about this due to the reprocessed. Maybe my concerns
> are unfounded--but I am lacking the information to get comfortable on
> this."

77.    On February 24, 2003, Kamber sent May and others an e-mail deflecting May's

concerns and telling May not to say anything more to the auditors:

> "I had the same concerns, however, given the reserves needed based on
> our presentation, we are wihtin [sic] the range assuming we get the credits
> for the opt outs.... I do not think we should be anymore forthcoming with
> PWC on the specifics. Its [sic] up to them to ask questions. Should the
> issue surface though, I will handle it from here, with your support."

78.    Two days later, May sent Kamber an e-mail again expressing concern over the

understatement of the Recall Reserve and advising that Kamber's rationale for not increasing it

was neither reasonable nor accurate:

> "Personally, I am still not comfortable with the situation ....
>
> We have only reserved for a 109 total (or 45 over) in our yearend
> numbers--but I heard 148 (84 over) in the presentation. This is a
> difference of over $8M in the reserve. I understand from [an e-mail
> sent by Centerpulse's General Counsel] that maybe the 148 needs to come
> down a bit--but even so, I think it is fair to say that my 109 number seems
> no longer reasonable ....
>
> I am just uncomfortable with my representation to PWC last week--where
> I say the remaining reserve at 12/31/02 is adequate to cover remaining
> liabilities. At the time I gave that representation, I was ok with it--after
> the Safari presentation, honestly I am not. I guess this is ok in that I
> limited my representation to what I knew at the time I made it--and now I

---

[6]    Although this sentence reads "My concern is that I am not more uncomfortable with the representation I
made in the PWC Management Rep letter," we believe May intended to write "I am now more uncomfortable"
given the surrounding context and an e-mail that he transmitted to Kamber on February 24, 2003, which is described
below.

know more . . . but it's an uneasy feeling, especially in the post-Enron environment. . . . I hope PWC does not ask me to sign an [sic] subsequent event representation--right now Urs I could not do it...."

79.    Despite May's concerns – both for the inadequacy of the Recall Reserve and his own liability – the Defendants did not increase the Recall Reserve, as May had concluded was necessary to account for the reprocessed shell surgeries.

80.    The Defendants improperly used approximately $5 million in anticipated refund credits from an "Extraordinary Injury Fund" to offset estimated losses chargeable to the Recall Reserve. This action was improper because, under FAS 5 and IAS No. 37, *Provisions, Contingent Liabilities and Contingent Assets*, an issuer cannot recognize a recovery or reimbursement of contingent losses until any uncertainty has been removed and/or it is "virtually certain" that recovery will be accomplished. Here, the Defendants knew or were reckless in not knowing that anticipated refunds from the Extraordinary Injury Fund were too uncertain to be recognized as income. Indeed, they had no reasonable basis upon which to gauge the certainty of receiving such credits because the claims process under which the credits might be generated had not even begun.

81.    Under U.S. GAAP, IFRS, and Centerpulse's accounting policy, it was improper not to increase the Recall Reserve by at least $23 million at year-end 2002. In particular, FAS 5 requires a company to reserve for losses when they are probable and estimable. Similarly, IAS 37 requires that the review and adjustment of liabilities at each balance sheet date reflect the best estimate of liability based on all available evidence. The Defendants knowingly or recklessly circumvented these requirements and engineered a false estimate of the Company's liability by ignoring probable and estimable liabilities, as well as specific facts indicating that the Company's Recall Reserve was inadequate.

82.     As described above, the Defendants knew or were reckless in not knowing that the Recall Reserve was understated by at least $10 million because they excluded 125 revision surgeries from the reserve which they knew had been missed in Centerpulse's previous liability estimates. The Defendants understated the Recall Reserve by an additional amount of approximately $8 million as a result of their February 2003 determination that the Company had not sufficiently accounted for "reprocessed shell" surgeries. Both of these liabilities were probable and estimable. Third, the Defendants improperly recognized approximately $5 million in anticipated refund credits from the Extraordinary Injury Fund to offset against the Recall Reserve even though such refund credits failed to meet the requirement of a "virtually certain" reimbursement.

83.     Ultimately, Centerpulse had no choice but to recognize the liabilities that the Defendants had omitted from the Company's year-end 2002 estimate. In July 2003, Centerpulse announced that it would increase the Recall Reserve by $45 million to account for greater than expected hip and knee revision surgeries and reprocessed shell surgeries. That initial increase was insufficient and, later that same quarter, Centerpulse again increased the Recall Reserve by another $45 million. The Defendants knew of these liabilities before finalizing the Company's year-end 2002 financial statements. The Defendants also knew or were reckless in not knowing that their refusal to increase the Recall Reserve as required by IFRS and U.S. GAAP improperly inflated and misstated the Company's year-end 2002 earnings.

**B.      Kamber and Husi Did Not Write Off**
**$3.4 Million in Costs for an Impaired Asset**

84.     Just as they had done in the third quarter of 2002, Kamber and Husi improperly ordered the Orthopedics VP not to write off $3.4 million in costs associated with the Global Supply Chain project in the fourth quarter of 2002, despite the fact that they knew the asset had

been impaired because the Company's European Orthopedics Division had abandoned the project.

85.    On December 20, 2002, the Orthopedics VP sent an e-mail to Husi stating that the U.S. Orthopedics Division would have a difficult time explaining to PwC-US why the asset was still on the Division's books:

> "I know this issue is definately [sic] a 'hot button' for a variety of reasons. However, please note the impact to our Budget cash flow due to the timing of this issue.  Also, COUS will have a difficult time with PWC at year end to defend this asset on our books.  I will be a team player and will try to substantiate it to PWC, however, I do not have a very good story to tell. The asset truly should be transferred to COAG and written off.... I will do what I can, however, their [sic] may be audit risks/implications."

86.    Husi replied that he understood the issue and indicated that he knew the accounting treatment was improper:

> "I have full understanding for the subject below and I am also not so happy with the treatment (just to wait).  it is for the time being Urs' instruction and we have to follow this.  But we must in our January discussion agree what we do with it.  We cannot just close our eyes."

87.    Despite knowing that proper accounting required the costs to be written off, Kamber and Husi ordered the U.S. Orthopedics Division not to write off the Global Supply Chain costs at year-end 2002.  This was contrary to U.S. GAAP and IFRS, which dictate that the costs be written off once the asset was impaired or unlikely to generate future economic benefits. Kamber and Husi also knew or were reckless in not knowing that their decision to improperly maintain these costs on Centerpulse's books inflated and misstated the Company's year-end 2002 income.

88.    Kamber, Husi and other Centerpulse executives in Switzerland perpetuated the fraud by sending a false representation letter to PwC-AG in connection with their audit.  Despite having no intention of implementing the Global Supply Chain software in Europe, Kamber and

Husi falsely told PwC-AG in the letter that management would reconsider the implementation of the software system at the European Orthopedics Division in 2003. The purpose of this false representation was to mislead PwC-AG into believing that the Global Supply Chain project was not impaired.

### C.    The Defendants' Fraudulent Accounting Inflated Centerpulse's Fiscal Year 2002 Pretax Income by Approximately $26.4 Million

89.    On March 20, 2003, Centerpulse issued its year-end 2002 financial results in a press release, later filed with the Commission, stating that reported EBITDA on a consolidated basis "increased in 2002 by CHF 103 million, or 43% to CHF 341 million [$221 million]…. EBITDA from continuing operations increased in 2002 by CHF 89 million, or 44%, to CHF 293 million [$190 million] …." According to the financial statements contained within this press release, Centerpulse reported CHF 337 million [$219 million] in annual net income for 2002. Centerpulse's reported EBITDA of CHF 341 million was in line with analysts' forecasts. Centerpulse furnished its year-end financial results press release to the Commission on March 28, 2003 in a Form 6-K.

90.    On April 23, 2003, Centerpulse filed its 2002 annual report on Form 20-F with the Commission. The annual report included Centerpulse's audited fiscal year 2002 financial results. The Defendants knew or were reckless in not knowing that the filing falsely or misleadingly stated that Centerpulse's consolidated financial statements were "prepared in accordance with International Financial Reporting Standards ('IFRS') and reconciled to generally accepted accounting principles in the United States ('U.S. GAAP')." Because of the Defendants' fraudulent accounting practices described above, Centerpulse falsely reported CHF 376 million, or $244 million, in pretax income for 2002, instead of $217.6 million, an overstatement of approximately 11 percent. The Form 20-F was materially false and misleading

also because, in the "Critical Accounting Policies" section of the filing, the Company stated that the amount of the Recall Reserve disclosed in the filing was "the best available estimate for the total costs of litigation based on the information known as of December 31, 2002." The Defendants knew or were reckless in not knowing that the fraudulent accounting practices they directed caused the Company to materially misstate its year-end 2002 results.

## IV.    THE DEFENDANTS PROFITED FROM THEIR MISCONDUCT

91.     Kamber, Husi and May each received bonuses, option awards and other payments that were based on or influenced by Centerpulse's inflated financial results and the accounting improprieties described in this Complaint.

92.     For 2002, Kamber received a bonus in the amount of at least CHF 135,000 and 17,000 stock options, which he exercised in February 2003 for over CHF 4.1 million in profits. In U.S. dollars, Kamber obtained over $2.7 million in ill-gotten gains as a result of his misconduct.

93.     For 2002, Husi received a bonus in the amount of CHF 40,500 and 304 stock options, which he exercised in 2003 for a profit of nearly CHF 73,000. In U.S. dollars, Husi obtained over $73,000 in ill-gotten gains as a result of his misconduct.

94.     For 2002, May received a bonus in the amount of $95,310 and 40,000 stock options, which he exercised in 2003 for a profit of nearly $500,000. In total, he obtained approximately $590,000 in ill-gotten gains as a result of his misconduct.

## FIRST CLAIM

### The Defendants Violated Exchange Act Section 10(b) and Rule 10b-5

95.     The Commission realleges paragraphs 1 through 94 above.

96.     Kamber, Husi and May each violated Exchange Act Section 10(b) and Exchange Act Rule 10b-5 [15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5].

97.     Between July 1, 2002 and May 1, 2003, the Defendants, directly or indirectly, by use of the means or instruments of interstate commerce, or of the mails, or the facility of a national securities exchange, in connection with the purchase or sale of securities, and with knowledge or recklessness:  (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person.

98.     The Defendants' scheme included, among other things, the following fraudulent devices, fraudulent acts, untrue statements of material fact, and material omissions:

   a.   Kamber, Husi and May did not record $25 million in attorneys' fees owed to Scruggs when such fees were incurred;

   b.   Kamber and Husi did not write off $3.4 million in costs pertaining to the Global Supply Chain project in the third and fourth quarters of 2002;

   c.   Kamber, Husi and May concurred in the improper release of $2.4 million from the SpineTech Division's sales, use and property tax reserve in the third quarter of 2002;

   d.   Kamber and Husi ordered improper accounting actions in the Dental Division in the third quarter of 2002, including a $1 million release from the inventory revaluation reserve;

   e.   At year-end 2002, Kamber, Husi and May did not increase the Recall Reserve by at least $18 million to cover probable and estimable liabilities arising from the settlement of the recall litigation;

f.   At year-end 2002, Kamber, Husi and May improperly used $5 million in anticipated refund credits related to the settlement to offset litigation-related expenses;

g.   Kamber and Husi helped prepare and approved Centerpulse's public filings, financial statements and press releases, including those furnished to and filed with the Commission, which they knew or were reckless in not knowing contained material misrepresentations about Centerpulse's income, revenues, expenses, assets and liabilities;

h.   May knew or was reckless in not knowing that Centerpulse's public filings, financial statements and press releases, including those furnished to and filed with the Commission, were materially false and misleading because they contained financial information from Centerpulse's U.S. operations which May knew or was reckless in not knowing contained material misrepresentations about those operations' income, revenues, expenses, assets and liabilities;

## SECOND CLAIM

### Husi and May Aided and Abetted a Fraudulent Scheme

99.   The Commission realleges paragraphs 1 through 94 above.

100.   Between July 1, 2002 and May 1, 2003, Husi and May aided and abetted violations by Centerpulse and Kamber of the federal securities laws and thereby violated Exchange Act Section 10(b) and Exchange Act Rule 10b-5. Centerpulse and Kamber perpetrated a fraudulent scheme in connection with the purchase or sale of securities in violation of Exchange Act Section 10(b) and Exchange Act Rule 10b-5 by committing the acts described in paragraphs 20-90 above. Pursuant to Exchange Act Section 20(e) [15 U.S.C. §78t(e)], Husi

and May knowingly provided substantial assistance to Centerpulse and Kamber in their perpetration of the fraudulent scheme.

## THIRD CLAIM

### The Defendants Aided and Abetted the Filing of False and Misleading Periodic Reports by Centerpulse

101.    The Commission realleges paragraphs 1 through 94 above.

102.    The Defendants aided and abetted Centerpulse's violations of the federal securities laws and thereby violated Exchange Act Section 13(a) and Exchange Act Rules 12b-20, 13a-1, and 13a-16 [15 U.S.C. § 78m(a); 17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-16].

103.    Centerpulse issued false and misleading periodic reports for the third quarter of 2002 and fiscal year 2002, which it furnished and filed with the Commission on Forms 6-K and 20-F, respectively, in violation of Exchange Act Section 13(a) and Exchange Act Rules 12b-20, 13a-1, and 13a-16. Pursuant to Exchange Act Section 20(e) [15 U.S.C. §78t(e)], the Defendants knowingly provided substantial assistance to Centerpulse in its filing of these false and misleading reports.

## FOURTH CLAIM

### Kamber Violated Exchange Act Rule 13a-14

104.    The Commission realleges paragraphs 1 through 94 above.

105.    Kamber violated Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14].

106.    In Centerpulse's 2002 annual report on Form 20-F, Kamber certified that he had reviewed the report and that, based on his knowledge, the report did not contain an untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading. Kamber also

certified that, based on his knowledge, the financial statements and information contained in the 2002 annual report on Form 20-F fairly presented in all material respects the financial condition, results of operations and cash flows of the Company. These statements were false and misleading because the Form 20-F contained untrue statements of material fact and omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading. Kamber knew or was reckless in not knowing that his certification and Centerpulse's Form 20-F were materially false and misleading.

## FIFTH CLAIM

### The Defendants Violated Exchange Act Section 13(b)(5) and Rule 13b2-1

107.    The Commission realleges paragraphs 1 through 94 above.

108.    The Defendants each violated Exchange Act Section 13(b)(5) and Exchange Act Rule 13b2-1 [15 U.S.C. § 78m(b)(5); 17 C.F.R. § 240.13b2-1] in that they knowingly circumvented or knowingly failed to implement a system of internal accounting controls at Centerpulse and directly or indirectly falsified books, records, and accounts at the Company.

## SIXTH CLAIM

### The Defendants Aided and Abetted Centerpulse's Failure to
### Maintain Accurate Books and Records and Internal Controls

109.    The Commission realleges paragraphs 1 through 94 above.

110.    The Defendants aided and abetted Centerpulse's violations of Exchange Act Sections 13(b)(2)(A) and 13(b)(2)(B) [15 U.S.C. § 78m(b)(2)(A) and (B)].

111.    Centerpulse did not make and keep books, records, and accounts that, in reasonable detail, accurately and fairly reflected transactions and dispositions of its assets. The Company failed to maintain accountability for assets and to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were

recorded as necessary to permit preparation of financial statements in conformity with IFRS and properly reconciled to U.S. GAAP. As a result, Centerpulse violated Exchange Act Sections 13(b)(2)(A) and 13(b)(2)(B).

112. Pursuant to Exchange Act Section 20(e) [15 U.S.C. §78t(e)], the Defendants knowingly provided substantial assistance to Centerpulse in connection with its failure to make and keep accurate books, records and accounts, and its failure to devise and maintain a sufficient system of internal accounting controls.

## SEVENTH CLAIM

### May Violated Exchange Act Rule 13b2-2

113. The Commission realleges paragraphs 1 through 94 above.

114. May violated Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

115. May, directly or indirectly, made or caused to be made materially false or misleading statements, or omitted to state, or caused another person to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading to one or more accountants in connection with audits, reviews, or examinations of Centerpulse's financial statements, or with the preparation or filing of documents or reports required to be filed with the Commission. Among other things, on February 18, 2003, May signed a series of management representation letters falsely stating that the Recall Reserve was adequate for the Company's remaining exposure related to the recall litigation.

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court:

**I.**

Enter judgment in favor of the Commission finding that Kamber, Husi and May each violated the federal securities laws and Commission Rules as alleged in this Complaint;

**II.**

Permanently enjoin Kamber from violating Exchange Act Sections 10(b) and 13(b)(5) and Exchange Act Rules 10b-5, 13a-14 and 13b2-1, and from aiding and abetting violations of Exchange Act Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B), and Exchange Act Rules 12b-20, 13a-1 and 13a-16;

**III.**

Permanently enjoin Husi from violating Exchange Act Sections 10(b) and 13(b)(5) and Exchange Act Rules 10b-5 and 13b2-1, and from aiding and abetting violations of Exchange Act Sections 10(b), 13(a), 13(b)(2)(A) and 13(b)(2)(B), and Exchange Act Rules 10b-5, 12b-20, 13a-1 and 13a-16;

**IV.**

Permanently enjoin May from violating Exchange Act Sections 10(b) and 13(b)(5) and Exchange Act Rules 10b-5, 13b2-1 and 13b2-2, and from aiding and abetting violations of Exchange Act Sections 10(b), 13(a), 13(b)(2)(A) and 13(b)(2)(B), and Exchange Act Rules 10b-5, 12b-20, 13a-1 and 13a-16;

**V.**

Order Kamber, Husi and May to account for and disgorge all bonuses, stock option awards and other ill-gotten gains that they received as a result of Centerpulse's inflated financial

results and the accounting improprieties described in this Complaint, and to pay prejudgment interest thereon;

## VI.

Order Kamber, Husi and May to pay civil monetary penalties pursuant to Exchange Act Section 21(d)(3);

## VII.

Bar Kamber, Husi and May from serving as officers or directors of a public company pursuant to Exchange Act Section 21(d)(2); and

## VIII.

Grant such equitable relief as may be appropriate or necessary for the benefit of investors pursuant to Exchange Act Section 21(d)(5) [15 U.S.C. § 78u(d)(5)].

## **DEMAND FOR JURY TRIAL**

The Commission hereby demands a trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

Dated:  Washington, DC
          October 16, 2007


Richard E. Simpson (RS-5859)
Christopher R. Conte
Vincente L. Martinez
Attorneys for Plaintiff
UNITED STATES SECURITIES
AND EXCHANGE COMMISSION
100 F Street, NE
Washington, DC 20549-4030
Tel:  (202) 551-4492 (Simpson)
Fax:  (202) 772-9246 (Fax)
simpsonr@sec.gov

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| **I (a) PLAINTIFFS** | **DEFENDANTS** |
|---|---|
| United States Securities And Exchange Commission | Urs Kamber, Stephan Husi, and Richard Jon May |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF<br>(EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT ____ Outside of U.S. ____<br>(IN U.S. PLAINTIFF CASES ONLY)<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Richard E. Simpson<br>Securities and Exchange Commission<br>100 F Street, N.E.<br>Washington, D.C. 20549-4030<br>(202) 551-4492 | KAMBER: Moses Silverman, Paul Weiss Rifkind Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019, (212) 373-3000<br>HUSI: Alan R. Friedman, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, (212) 715-9100<br>MAY: Bruce M. Bettigole, Mayer Brown Rowe & May LLP, 1909 K Street, N.W., Washington, D.C. 20006, (202) 263-3000 |

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- ◉ 1 U.S. Government Plaintiff
- ○ 2 U.S. Government Defendant
- ○ 3 Federal Question (U.S. Government Not a Party)
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**○ A. Antitrust**
- ☐ 410 Antitrust

**○ B. Personal Injury/ Malpractice**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Medical Malpractice
- ☐ 365 Product Liability
- ☐ 368 Asbestos Product Liability

**○ C. Administrative Agency Review**
- ☐ 151 Medicare Act

Social Security:
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g)
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

Other Statutes
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**○ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**○ E. General Civil (Other)    OR    ○ F. Pro Se General Civil**

Real Property
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

Personal Property
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

Bankruptcy
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

Property Rights
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

Federal Tax Suits
- ☐ 870 Taxes (US plaintiff or defendant
- ☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
- ☐ 610 Agriculture
- ☐ 620 Other Food &Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

Other Statutes
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation

- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 810 Selective Service
- ☒ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 900 Appeal of fee determination under equal access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| **G.** *Habeas Corpus/ 2255* | **H.** *Employment Discrimination* | **I.** *FOIA/PRIVACY ACT* | **J.** *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| **K.** *Labor/ERISA (non-employment)* | **L.** *Other Civil Rights (non-employment)* | **M.** *Contract* | **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

15 U.S.C. §§ 78u(d), 78u(e), 78aa. Securities violations and financial fraud.

**VII. REQUESTED IN COMPLAINT** ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $ 3,363,000+   Check YES only if demanded in complaint   JURY DEMAND: YES ☒  NO ☐

**VIII. RELATED CASE(S) IF ANY** (See instruction) YES ☐  NO ☒  If yes, please complete related case form.

DATE October 17, 2007   SIGNATURE OF ATTORNEY OF RECORD  *Richard E. Lofason*

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.  COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.