## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**RICHARD MAY, et al.,**<br><br>**Defendants.** | **Civil Action No.  07-1867 (JDB)** |

## <u>MEMORANDUM OPINION</u>

This is a civil action brought by the Securities and Exchange Commission ("SEC")

against Richard May alleging that he violated various securities laws while an executive at

Centerpulse Limited.  The SEC's complaint also contains counts against two of May's

Centerpulse colleagues, Urs Kamber and Stephan Husi, both of whom have since consented to

final judgment in favor of the SEC.  Now before the Court is May's motion for summary

judgment.  For the reasons described below, the motion will be granted in part and denied in

part.

## BACKGROUND

At all times relevant to the complaint, May was a group vice president of the U.S.

subsidiary of Centerpulse Limited, a Swiss medical technology company.  May SOF ¶¶ 1, 9 and

SEC Resp. at 1, 4.[1]  May functioned as the chief financial officer of Centerpulse's U.S. group of

companies.  SEC Stat. of Add. Mat. Facts ¶ 1.  Centerpulse manufactured, among other things,

hip and knee implants used in reconstructive surgeries.  In the late 1990s or early in 2000,

---

[1] This citation refers to May's Statement of Undisputed Facts and the SEC's statement in
response thereto.

Centerpulse learned that some of its implants were defective and attempted to fix (or

"reprocess") them.  But by late 2000, it began recalling the defective implants.  May SOF ¶¶ 16-

17 and SEC Resp. at 6.  Patients who had received the original defective implants were forced to

undergo "revision surgeries," and patients who had received reprocessed implants were forced to

undergo "reprocessed revision surgeries."  May SOF ¶ 18 and SEC Resp. at 6.

Lawsuits against Centerpulse were soon commenced as a result of the defects.  A class

action filed by affected patients was consolidated in the District Court for the Northern District

of Ohio, and a settlement agreement was approved by the court on May 8, 2002.  May SOF ¶ 26

and SEC Resp. at 9.  The settlement agreement established a trust, which provided compensation

for up to 4000 plaintiffs who had undergone revision surgeries and 64 plaintiffs who had

undergone reprocessed revision surgeries.  May SOF ¶ 27 and SEC Resp. at 9.  Centerpulse was

required to pay 50 percent of the cost of any revision surgeries in excess of 4000 and 100 percent

for any reprocessed revision surgeries in excess of 64.  May SOF ¶¶ 28-29 and SEC Resp. at 9-

10.

Centerpulse was represented by an attorney named Richard Scruggs to settle the class

action.  May SOF ¶ 91 and SEC Resp. at 25.  The company agreed to pay Scruggs a $5 million

fee, plus $20 million (in Centerpulse stock) should he achieve a satisfactory result.  May SOF ¶

92 and SEC Resp. at 25.  By the time the settlement agreement was finalized, Centerpulse's stock

price had soared and Scruggs claimed he was entitled to a payment of substantially more than

$20 million.  May SOF ¶ 94 and SEC Resp. at 25.  In late summer or early fall 2002, Kamber,

Centerpulse's chief financial officer, told May that Scruggs would receive two additional

payments of $10 million and $15 million on October 1, 2002 and November 4, 2002,

respectively.  May SOF ¶ 100 and SEC Resp. at 27.  The parties dispute whether those payments

were subject to any contingencies.  See id.  May executed the payments as scheduled, and Centerpulse accrued the additional payments in 4Q02.[2]  The SEC alleges that failure to accrue the $25 million in 3Q02 violated the securities laws.  See Compl. ¶¶ 98(a), (h); 100; 108; 110-12; 114-15.

Centerpulse created a "recall reserve" to account for its potential liability related to the revision and reprocessed revision surgeries.  May SOF ¶ 19 and SEC Resp. at 7.  In mid-2002, the recall reserve was $873 million, which Centerpulse's auditors -- PricewaterhouseCoopers ("PwC") -- determined was reasonable.  May SOF ¶ 35 and SEC Resp. at 11.  On February 18, 2003, May, along with other Centerpulse executives, signed a representation letter to PwC.  The letter stated that the $873 million reserve remained adequate to cover liabilities related to the recall.  May Mem. App. Tab 9 at 4-5.[3]  On April 25, 2003, Centerpulse filed its Form 20-F for 2002.  Id. Tab 16.  The company again did not revise the recall reserve.  See id. Tab 16 at 6, 69-70.  The SEC alleges that the failure to revise the recall reserve in the representation letter and the Form 20-F violated Generally Accepted Accounting Principles ("GAAP") and hence violated certain provisions of the U.S. securities laws.  According to the SEC, the recall reserve was understated for three reasons.

## I.  Miscounts Issue

In July 2002, Centerpulse discovered that one of its internal databases, which the company relied upon to estimate the expected number of revision surgeries, erroneously did not

---

[2] "4Q02" refers to the fourth quarter of 2002, i.e., the quarter beginning on October 1, 2002.  The Court will refer to financial quarters using this shorthand throughout this opinion.

[3] Each party submitted an appendix with their memoranda supporting or opposing summary judgment.  The Court refers to the appendix attached to May's memorandum as "May Mem. App." and the SEC's appendix as "SEC App."

include 125 surgeries.  May SOF ¶ 36 and SEC Resp. at 12.  The precise impact of the error is disputed, but in October 2002 Centerpulse and plaintiffs' class action counsel agreed that the company would pay an additional $10 million into the settlement trust to account for the miscounts.  May SOF ¶ 41 and SEC Resp. at 12.  The court overseeing the settlement rejected this amount as too low, and instead proposed a $25 million increase.  May SOF ¶ 42 and SEC Resp. at 13.  Centerpulse's counsel, David Wise, persuaded the court to wait until the number of revision surgeries exceeded 4000 before fixing the amount of the increase.  May SOF ¶ 43 and SEC Resp. at 13.  May analyzed the potential impact of the miscounts on the recall reserve and proposed increasing it by $10 million, but ultimately elected to exclude any provision regarding the miscounts for year-end 2002.  May SOF ¶¶ 44-45 and SEC Resp. at 13-14.  The SEC alleges that the recall reserve was understated by $10 million because of the miscounts issue.  See Compl. ¶¶ 98(e), (h); 100; 102-03; 108; 110-12; 114-15.

## II.  EIF Credit Issue

Following the settlement agreement, certain plaintiffs opted out of the class.  In mid-2002, potential liability because of those plaintiffs was accounted for in the recall reserve.  May SOF ¶ 82 and SEC Resp. at 22.  The company then persuaded some of the plaintiffs to opt back into the class.  In exchange for a payment of an agreed-upon amount, the plaintiffs would opt back in, seek maximum benefits under the settlement agreement, and pay any benefits received back to Centerpulse.  Id.  The benefits under the settlement agreement would not only include a $206,000 standard payment, but also payments from an Extraordinary Injury Fund ("EIF"), which was also part of the recall reserve.  May SOF ¶¶ 81, 83 and SEC Resp. at 22-23.  In January 2003, May calculated that the plaintiffs opting back into the class would pay back $5.4 million to the EIF, and hence credited $5.4 million to the recall reserve.  May SOF ¶¶ 88-89 and

SEC Resp. at 23-24.  According to the SEC, the recall reserve was inflated by $5.4 million

because of the EIF credit issue.  See Compl. ¶¶ 98(f), (h); 100; 102-03; 108; 110-12; 114-15.

## III.  Reprocessed Revisions Issue

In February 2003, another medical technology company, Smith & Nephew, considered

purchasing Centerpulse.  May SOF ¶ 62 and SEC Resp. at 18.  Smith & Nephew estimated that

the company faced an additional $300 million liability because of the revision and reprocessed

revision surgeries.  May SOF ¶ 63 and SEC Resp. at 18.  To address Smith & Nephew's

concerns, Centerpulse made a presentation on February 20, 2003, which estimated that it faced

148 reprocessed revision surgeries.  May SOF ¶ 69 and SEC Resp. at 19.  May had previously

estimated that the company faced only 109 reprocessed revisions in calculating the recall

reserve.  May informed Kamber, among others, that the recall reserve should be increased by

$8.3 million if the company believed that it faced 148 reprocessed revision surgeries.  May SOF

¶ 69 and SEC Resp. at 19-20.  Despite May's concerns, Centerpulse did not revise the recall

reserve for year-end 2002, and the SEC avers that the recall reserve was thereby understated by

$8.3 million.[4]  See Compl. ¶¶ 98(e), (h); 100; 102-03; 108; 110-12; 114-15.

## STANDARD

## I.  Standard of Review

Summary judgment is appropriate when the pleadings and the evidence demonstrate that

"there is no genuine issue as to any material fact and that the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial

---

[4] In its Complaint, the SEC also alleges that May violated the securities laws by understating the sales, use and property tax reserve of Centerpulse's Spinetech Division.  See, e.g., Compl. ¶¶ 51-55, 98(c).  The SEC has since abandoned these claims, see May SOF ¶ 104 and SEC Resp. at 29, and May's summary judgment motion will be granted as to all Spinetech-related claims.

responsibility of demonstrating the absence of a genuine dispute of material fact.  See Celotex

Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The moving party may successfully support its

motion by identifying those portions of "the pleadings, the discovery and disclosure materials on

file, and any affidavits" which it believes demonstrate the absence of a genuine issue of material

fact.  Fed. R. Civ. P. 56(c); see Celotex, 477 U.S. at 323.

In determining whether there exists a genuine issue of material fact sufficient to preclude

summary judgment, the court must regard the non-movant's statements as true and accept all

evidence and make all inferences in the non-movant's favor.  See Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 255 (1986).  A non-moving party, however, must establish more than the

"mere existence of a scintilla of evidence" in support of its position.  Id. at 252.  By pointing to

the absence of evidence proffered by the non-moving party, a moving party may succeed on

summary judgment.  Celotex, 477 U.S. at 322.  "If the evidence is merely colorable, or is not

significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50

(citations omitted).  Summary judgment is appropriate if the non-movant fails to offer "evidence

on which the jury could reasonably find for the [non-movant]."  Id. at 252.

## II.  Legal Standards

The SEC claims that May violated three aspects of the U.S. securities laws.  First, the

SEC claims that May was a primary violator of, and aided and abetted violations of, § 10(b) of

the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b-5, 17 C.F.R. § 240.10b-5

(collectively, "Antifraud Provisions").  Next, the SEC contends that May violated, and aided and

abetted violations of, § 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5), and Rule 13b2-1,

17 C.F.R. § 240.13b2-1 (collectively, "Books & Records Provisions").  Finally, the SEC raises

claims under Rule 13b2-2, 17 C.F.R. § 240.13b2-2 ("False Statements Provisions").

A. *Antifraud Provisions*

To establish primary liability under the Antifraud Provisions, the SEC must prove that May "(1) made a misrepresentation, or an omission (where there was a duty to speak), or other fraudulent device; (2) that was material in the case of a misrepresentation or omission; (3) in connection with the sale or purchase of a security; (4) . . . acted with scienter; and (5) the involvement of interstate commerce, the mails or a national security exchange." SEC v. Lucent Technologies, Inc., 363 F. Supp. 2d 708, 714 (D.N.J. 2005) (citing SEC v. Adoni, 60 F. Supp. 2d 401, 405 (D.N.J. 1999)).  On the fourth element, the SEC must prove that May acted with an "intent . . . to deceive, manipulate, or defraud." Aaron v. SEC, 446 U.S. 680, 686 (1980).  "[A]n inference of scienter must be more than merely plausible or reasonable -- it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314 (2007).

The first element for primary liability merits some further discussion.  The parties appear to agree with the standard as recently stated by the Tenth Circuit in SEC v. Wolfson, 539 F.3d 1249, 1261 (10th Cir. 2008).  See May Mem. at 17; SEC Opp'n at 30.  There, as here, the court was confronted with a claim that a secondary actor (like May) could be held liable as a primary violator.  The court held that the SEC need not prove that the defendant actually made a misrepresentation or omission for primary liability -- it need only show that he "caused the misstatements and omissions to be made, and knew that the statements were calculated to reach investors." Wolfson, 539 F.3d at 1261.  In describing this standard, the Wolfson court assessed three other approaches courts have used in assessing primary liability for secondary actors. Id. at 1258-61.  Although the Court will apply the standard as announced in Wolfson, the other approaches inform what it means to have "caused" a misstatement to be made.

-7-

The most demanding alternative approach is sometimes called the "bright-line" approach. Id. at 1258.  Under that approach, a secondary actor must not only make a material misstatement or omission, but "the misrepresentation must be attributed to the specific actor at the time of public dissemination."  See Wright v. Ernst & Young, LLP, 152 F.3d 169, 175 (2d Cir. 1998). The purpose of the attribution requirement is to parallel the elements of a private securities action, which requires proof of reliance.  Id.  Some circuits have rejected this approach for that very reason.  See Wolfson, 539 F.3d at 1259-60 ("Requiring the government to prove attribution in a public enforcement action thus directly conflicts with our jurisprudence recognizing that the SEC need not plead and prove reliance in a § 10(b) case.") (emphasis in original).  The easiest approach for the SEC to satisfy is called the "substantial participation" approach.  See Howard v. Everex Sys., Inc., 228 F.3d 1057, 1061 n.5 (9th Cir. 2000).  The substantial participation approach attaches primary liability to a secondary actor upon a showing that he substantially participated or was intricately involved in making a material misstatement or omission.  See In re Software Toolworks, Inc. Sec. Litig., 50 F.3d 615, 628 n.3 (9th Cir. 1994).  This approach has been dismissed by other circuits as essentially a reformulation of the "substantial assistance" requirement for aiding and abetting liability (discussed below).  See Anixter v. Home-Stake Prod. Co., 77 F.3d 1215, 1226 n.10 (10th Cir. 1996).  The third alternative approach has been dubbed the "creation" test.  See Wolfson, 539 F.3d at 1259 n.16.  That approach requires a secondary actor to have "created" a misrepresentation or omission relied upon by investors.  See In re Enron Corp. Sec., Derivative, & ERISA Litig., 235 F. Supp. 2d 549, 586-91 (S.D. Tex. 2002).

This variety of approaches helps give meaning to Wolfson's causation standard.  It is not as demanding as the bright-line approach; the SEC need not show that a statement was

specifically attributed to the defendant.  Nor is causation as easy to satisfy as the substantial

participation standard -- merely taking part in a decision or being "intricately involved" in it will

not suffice.  Instead, to show that a secondary actor caused the statements to be made, the SEC

must show that he "played an integral role in preparing those filings that contained the

misstatements and omissions at issue."  Wolfson, 539 F.3d at 1261.

        As for aider and abettor liability on the 10(b) claims, the SEC must prove that (1) a

principal committed a primary violation; (2) the aider and abettor provided "substantial

assistance" to the violator; and (3) the aider and abettor acted with scienter.  SEC v. Johnson,

530 F. Supp. 2d 315, 322 (D.D.C. 2008) (citing, inter alia, Graham v. SEC, 222 F.3d 994, 1000

(D.C. Cir. 2000)).  The scienter element for aiding and abetting requires a showing that May

"knowingly" provided substantial assistance.  Id.

## B.  Books & Records Provisions

        Section 13(b)(5) of the Exchange Act provides that "[n]o person shall knowingly

circumvent or knowingly fail to implement a system of internal accounting controls or

knowingly falsify any book, record, or account."  15 U.S.C. § 78m(b)(5).  Rule 13b2-1 provides

that "[n]o person shall directly or indirectly, falsify or cause to be falsified, any book, record or

account."  17 C.F.R. § 240.13b2-1; McConville v. SEC, 465 F.3d 780, 789 (7th Cir. 2006).  A

defendant who violates either § 13(b)(5) or Rule 13b2-1 is a primary violator.  A defendant who

is not himself a primary violator, but has knowledge of a primary violation[5] and provides

substantial assistance in it, is liable as an aider and abettor.  See Ponce v. SEC, 345 F.3d 722,

---

        [5] Submission of false or misleading financial reports can also constitute primary
violations of the reporting requirements.  See Rule 12b-20, 17 C.F.R. § 240.12b-20 (requiring
reports to include information "as may be necessary to make the required statements . . . not
misleading"); Rule 13a-1, 17 C.F.R. § 240.13a-1 (requiring annual reports to be filed); and Rule
13a-16, 17 C.F.R. § 240.13a-16 (requiring foreign private issuers to file quarterly reports).

737 (9th Cir. 2003) (setting forth aider and abettor liability for § 13 claims upon review of aider and abettor liability for violations of other securities laws).

*C. False Statements Provisions*

"Rule 13b2-2 provides: 'No director or officer of an issuer shall, directly or indirectly: (1) make or cause to be made a materially false or misleading statement to an accountant in connection with . . . (i) [a]ny audit, review or examination of the financial statements of the issuer . . . ." McConville, 465 F.3d at 789 (quoting 17 C.F.R. § 240.13b2-2) (ellipses in original).

## ANALYSIS

The SEC raises five kinds of claims[6] regarding four issues.[7]  The analysis that follows is organized by issue, and examines each claim in turn.  Each issue has an initial threshold question.  The SEC's claims are predicated on Centerpulse failing to recognize certain liabilities as required under GAAP.  If no reasonable fact-finder could conclude that Centerpulse was required to recognize a certain liability under GAAP, and if no genuine issues of material fact exist, then the SEC's claims fall apart with regard to that issue.

**I.  Scruggs Issue**

The SEC alleges that Centerpulse was required to accrue the Scruggs payments in 3Q02. See SEC Opp'n at 30.  The parties do not dispute that, under GAAP, loss contingencies must be accrued when a liability becomes probable and is reasonably estimable.  See Statement of

---

[6] Violations of the Antifraud Provisions (both as a primary violator and as an aider and abettor), violations of the Books & Records Provisions (again both as a primary violator and as an aider and abettor), and violations of the False Statements Provisions (as a primary violator only).

[7] The Scruggs issue, the miscounts issue, the EIF credit issue, and the reprocessed revisions issue.

Financial Accounting Standards ("FAS") No. 5(8) (attached as SEC App. A741-42).[8]  The

parties do dispute, however, whether the additional Scruggs payments had become probable in

3Q02.  According to May, the payments were subject to contingencies until 4Q02.  See May

Mem. at 21.  But as the SEC points out, May knew the exact timing and amount of the Scruggs

payments during 3Q02.  See SEC App. at A731 (Sept. 5, 2002 email setting forth "the amounts

and dates for the Scruggs payments").  Whether the Scruggs liability had become probable and

reasonably estimable in 3Q02 is a genuine factual dispute that cannot be resolved on summary

judgment.

     The question, then, is whether a fact-finder could reasonably conclude that May violated

the securities laws because of his role regarding the additional Scruggs payments.  May was

involved with the Scruggs payments in two ways.  First, he arguably supplied Kamber with a

rationale for delaying accrual of the payments until 4Q02.  In a September 19, 2002 email,

Kamber asked May how to "camouflage" the additional payments.  SEC App. at A801-02.  In

response, May wrote that:

> One idea we might consider is whether the Scrugg's [sic] payments
> are more properly costs of the [cardiopulmonary division]
> divestiture.  Maybe the facts support this more logically than
> taking them against the settlement reserve.  Just an idea.  Given
> today's accounting environment, I am not completely comfortable
> this makes sense -- but then again, I am not completely familiar
> with the facts to make that judgment.

Id. at A800.  A reasonable fact-finder could interpret this email as providing an excuse -- i.e., as

"camouflage" -- for not recognizing the additional payments in 3Q02.  Second, as treasurer of the

U.S. subsidiary of Centerpulse, May organized and executed the additional payments to Scruggs

on October 1, 2002 and November 4, 2002.  See id. at A733-34 (wire requests bearing May's

---

[8] FAS are a component of GAAP.  See May Mem. at 4 n.2.

signature for additional payments to Scruggs).

The SEC alleges that May is liable as a primary violator of the Antifraud Provisions because "he took part in the decision to understate the company's expenses in [3Q02] by delaying recognition of the $25m additional payment to Scruggs until 4Q02." SEC Opp'n at 30. The first required element for a primary violation of the Antifraud Provisions requires the defendant to have "caused the misstatements and omissions to be made, [with knowledge] that the statements were calculated to reach investors." See Wolfson, 539 F.3d at 1261. Here, there is no genuine issue of material fact that May did not cause misstatements to be made. The SEC merely alleges that May "took part" or "participated" in the decision not to accrue the payments in the 3Q02 6-K filing. See, e.g., SEC Opp'n at 13, 30. "Causation" cannot be satisfied by mere "participation"; to allow otherwise would risk conflating the standards for primary liability and aiding and abetting. See Anixter, 77 F.3d at 1226 n.10. Hence, summary judgment will be granted in May's favor with regard to the primary liability claim on the Scruggs issue.

A reasonable fact-finder could, however, determine that May aided and abetted violations of the Antifraud Provisions. Although May could not have "caused" recognition in 4Q02, a reasonable fact-finder could determine that he provided "substantial assistance" in delaying recognition until 4Q02. He supplied a rationale for the delay and executed the first payment on the first day of 4Q02 despite his stated discomfort with a potential contingency clearing the day after 3Q02. See SEC App. at A12-13. And a fact-finder could reasonably interpret May's deposition testimony as revealing that he was aware that waiting to accrue the Scruggs payments until 4Q02 was improper. For example, when confronted with emails that show May recommended accrual in 3Q02, May explained that he had "a concern that [the Scruggs payment] should be accrued at the end of the third quarter, but every time I raise that concern

[Kamber] gives the facts that support that it should be accrued in the fourth quarter."  SEC App. at A87.  May also testified that if he had been the chief financial officer, he "would have reserved for [the Scruggs payments] in the second or third quarter."  Id. at A84.  Hence, the existence of a genuine issue of material fact defeats summary judgment as to the SEC's aiding and abetting claim.

Next are the SEC's claims that May violated the Books & Records provisions -- both as a primary violator and as an aider and abettor.[9]  According to the SEC, May failed to account for the Scruggs payments in accordance with GAAP and failed to retain adequate documentation to support recognizing the payment in the proper reporting period.  See SEC Opp'n at 34.  As discussed above, a genuine issue of material fact exists as to whether the Scruggs payments should have been accrued in 3Q02.  A reasonable fact-finder could also conclude that May failed to retain adequate documentation, thereby violating Centerpulse's accounting policies.  Even if May was not responsible for Centerpulse's financial statements as a whole, see May Mem. at 1, a genuine issue of material fact exists as to whether May was responsible for accounting for the Scruggs payments and retaining adequate documentation.  He did, after all, represent himself as being responsible for "direct supervision of the finance (accounting, controlling and treasury)" areas of Centerpulse's U.S. subsidiary.  See SEC App. at A356.  And Centerpulse lists "[d]ocumentation (complete audit trail/voucher principle)" under its general concepts of proper accounting.  SEC App. at A1552.  Hence, May's motion for summary judgment on the Scruggs issue will be denied as to the SEC's claims under the Books & Records Provisions.

---

[9] The SEC does not allege that May violated the False Statements Provisions with regard to the Scruggs issue.  See SEC Opp'n at 33.

## II.  Miscounts Issue

According to the SEC, failure to account for an additional $10 million liability because of the miscounts constitutes a violation of GAAP.  Loss contingencies must be accrued when a liability becomes probable and is reasonably estimable.  See FAS 5(8).  The SEC points out that upon learning about the miscounts, Centerpulse initially agreed to increase the settlement reserve by $10 million, but the judge overseeing the settlement rejected that amount as too low.  See Deposition of David Wise at 74:6-15 (attached as May Mem. App. Tab 15).  May contends that once the $10 million settlement was rejected, it became possible that there would be no additional liability at all.  See May Mem. at 22-23.  He relies on Wise's deposition to support that contention.  But such a characterization of Wise's testimony is a stretch.  Wise stated that it would not have been proper to reserve $25 million -- the amount proposed by the judge in light of the miscounts.  Wise Dep. at 75:2-10.  Wise explained that he had persuaded the judge to "table the issue" at that time because "[n]o one could say with certainty that we were going to bust through 4000."  Id. at 74:16-25.  Wise's testimony, however, does not establish that it would have been reasonable not to increase the reserve at all.  And given that Centerpulse itself had agreed to pay $10 million and that May himself appeared to believe that at least an additional $10 million had to be reserved as a result of the miscounts, see SEC App. at A896, a genuine issue of material fact exists as to whether failure to warn about an additional $10 million liability violated GAAP.

*A. Antifraud Provisions*

1. February 18, 2003 Representation Letter

The representation letter, written in connection with the audit of Centerpulse's orthopedics division at year-end 2002, describes the recall reserve and states that "we believe the

remaining reserve of $32 million is adequate for the remaining exposure." May Mem. App. Tab 9. It does not address the miscounts at all. May, among others, signed the letter. The question, then, is whether a reasonable fact-finder could find that failure to account for the miscounts in the letter constitutes a violation of the Antifraud Provisions (as both a primary violator and as an aider and abettor), as alleged by the SEC. See SEC Opp'n at 30, 32. The SEC alleges that May removed a provision regarding the $10 million liability in response to improper pressure from Kamber and Husi and not for any permissible reason under GAAP. See id. at 30. May counters that he removed the $10 million provision because of advice from Wise.

Wise told May sometime in the fall of 2002 that he had convinced the judge not to increase Centerpulse's liability to $25 million. See Wise Dep. at 74:6-25; May Dep. at 134:21-135:9. Yet on January 24, 2003, May sent an email to Kamber and Husi and proposed increasing the recall reserve by $78 million, including a $25 million increase because of the miscounts issue. SEC App. at A896. Kamber responded: "This is crazy!! We will get killed with this." Id. And Husi told May that "[t]he goal must be to substantially reduce the accruals proposed by you. . . . We must together find an argumentation to get there." Id. at A900. May responded that he would do his best, but reminded them that "I am not a miracle worker." Id. Three days later, May proposed increasing the reserve by $10 million to account for the miscounts rather than $25 million, and then proposed no increase at all. See id. at A905, A1253. Hence, there is a genuine issue of material fact as to whether May eliminated proposed increases to the recall reserve because of pressure from Kamber and Husi or because of advice from Wise.[10] Because May signed the February 18 representation letter to PwC, a reasonable fact-

---

[10] May explains that he often exaggerated his position in dealing with Kamber and Husi in order to keep their attention on an issue. See May Reply at 10-11. The credibility of this rationale, too, is for the fact-finder to decide.

finder could determine that he was a primary violator of the Antifraud Provisions.  Similarly, a

fact-finder could also determine that May substantially assisted -- i.e., aided and abetted -- a

violation of the Antifraud Provisions.  Accordingly, May's summary judgment motion will be

denied on this claim.

     2.  Form 20-F

     Like the representation letter, the 2002 Report on Form 20-F did not mention the impact

of the miscounts and reported that fewer than 4000 claims were "likely to be valid."  See May

Mem. App. Tab 16 at 6.  Although May did not draft the Form 20-F, he created the model (and

gathered the data) that formed the basis for the provisions regarding the number of likely valid

claims.  See May Reply at 11-12.  He was, therefore, a secondary actor with regard to the Form

20-F.  The crucial question, then, is whether May "caused" a misstatement to be made -- as

required for primary liability, see Wolfson, 539 F.3d at 1261 -- or whether he merely provided

"substantial assistance" -- as required for aiding and abetting liability, see Graham, 222 F.3d at

1000.

     The causation standard requires more than "substantial participation" in an inaccurate

filing.  The courts that have adopted the causation standard for secondary actor primary liability

have expressly rejected the substantial participation standard as too similar to the "substantial

assistance" standard for aiding and abetting liability.  See Anixter, 77 F.3d at 1226 n.10.

Causation is only satisfied if a secondary actor had a "central" or "integral" role in submitting an

inaccurate SEC filing.  See Wolfson, 539 F.3d at 1261.  In McConville, 465 F.3d at 787-88, for

example, the former chief financial officer of a company "drafted and reviewed the core financial

statements that overestimated [the company's] profits; . . . reviewed and approved a draft of the

Form 10-K that consisted of the inaccurate core financial statements; and in a . . . letter to [the

company's auditors], [she] represented that management had reviewed the financial statements for impairments of [the company's] assets, and that no adjustment to the statements was required."  The court concluded that the defendant's "substantial involvement" effectively "caused" the inaccurate filing.  Id. at 787.  Similarly, in Wolfson, the defendant prepared the drafts of the inaccurate filings, and at least one of the documents was filed without any changes to the draft -- "[i]t was filed as [he] drafted it."  539 F.3d at 1261.  The defendant played "an integral role in preparing [the] filings that contained the misstatements" because he had been hired "for the very purpose of preparing the relevant SEC filings."  Id.; see also SEC v. KPMG, LLP, 412 F. Supp. 2d 349, 376-77 (S.D.N.Y. 2006) (holding that engagement partners who had "the ultimate authority to determine whether an audit opinion should be issued" and who were responsible for "forming the audit opinion" effectively caused an inaccurate audit opinion to be issued).

Although a fact-finder could reasonably conclude that May provided substantial assistance in compiling the Form 20-F, he cannot be said to have caused the misstatements to be made by devising the model that generated the expected number of claims.  May was not responsible for drafting the Form 20-F, in contrast to the situations in Wolfson and McConville. Nor did he have "ultimate authority" over it, as was the case in KPMG.  To be sure, the term "causation" can be interpreted in many different ways.  But courts deciding cases arising under the securities laws have interpreted it to mean more than assisting, participating in, or creating a component of a misleading statement.  See Wolfson, 539 F.3d at 1259-61.  They have required that the defendant was "integral" or "central" to the filing of the document as a whole.  See id. May's involvement does not rise to that level.  Indeed, to interpret his role here as causative would risk conflating the primary liability standard with the standard for aiding and abetting, a

concern that animated the <u>Wolfson</u> court in explaining the causation standard.  Hence, no

reasonable fact-finder could determine that May is a primary violator of the Antifraud Provisions

for his role regarding the 20-F, although a reasonable fact-finder could determine that he aided

and abetted violations.  Summary judgment will be granted in part and denied in part

accordingly.

*B.  False Statements and Books & Records Provisions*

The SEC contends that May violated the False Statements Provisions, <u>see</u> SEC Opp'n at

33, and that he is liable for violations of Books & Records Provisions as both a primary violator

and as an aider and abettor, <u>see id.</u> at 34.  These claims are sufficiently similar to merit

consolidated discussion.  The issue as to the representation letter is straightforward.  The SEC

asserts that May falsely stated in the representation letter that the recall reserve was adequate,

thereby violating GAAP.  <u>See id.</u> at 33, 34.  As discussed above, a fact-finder could reasonably

determine that, given the miscounts, a representation that the recall reserve was "adequate for the

remaining exposure" was false, <u>see</u> May Mem. App. Tab 9, and that failure to update the reserve

as a result of the miscounts violated GAAP.  Accordingly, summary judgment will be denied on

this issue.

The SEC's claims as to the Form 20-F are slightly more complicated.  According to the

SEC, "[b]efore the company filed the [Form 20-F], data became available to May showing that

the company would exceed 4,000 revision surgeries, triggering the loss exposure for the

miscounts."  <u>Id.</u> at 33.  The SEC alleges that May's failure to update PwC about the new data

before filing the 20-F on April 25, 2003 constitutes a violation of the False Statements and

Books & Records Provisions.  <u>See id.</u> at 33, 34.  The SEC takes issue with the assumptions

underlying May's estimate.  <u>See id.</u> at 18.  Had May based his model on more reasonable

assumptions, the SEC contends, his estimate of the likely number of claims would have exceeded 4000 before the Form 20-F was filed.  In particular, the SEC disputes two of May's assumptions:  that no new claims would be filed after twenty weeks (despite claims-filing deadlines 44 or 68 weeks away, depending on the type of claim) and that the "run-rate" of new claims would be ten per week.  See id. at 19.  According to the SEC, the likely number of claims would have exceeded 4000 by April 11, 2003 under a more realistic run-rate.  Whether May's assumptions were reasonable presents a genuine issue of material fact -- and if his assumptions were not reasonable, then there is a genuine issue of material fact as to whether May was aware that his assumptions were unreasonable.  Hence, summary judgment will be denied on this issue.

## III.  EIF Credit Issue

The SEC asserts that Centerpulse improperly claimed a $5.4 million EIF credit to avoid increasing the recall reserve.  The SEC contends that May violated GAAP by recognizing a gain before it had been realized, thereby violating FAS 5(17) and International Accounting Standard 37(33).  See SEC Opp'n at 22.  May points out that the EIF credits were not gains, but rather offset a potential liability.  See May Reply at 16.  But even if the credits are properly viewed as impacting the size of the potential liability, loss contingencies must be accrued when a liability becomes probable and is reasonably estimable.  See FAS 5(8).  Hence, the relevant question is whether the $5.4 million EIF credit was sufficiently probable to permit a corresponding reduction of the recall reserve.

The EIF refund credits stemmed from an agreement reached between Centerpulse and patients who had initially opted out of the class action.  Thirty-one of those patients agreed to rejoin the class.  In exchange for a payment of an agreed-upon amount, the patients would opt back in, seek maximum benefits under the settlement agreement, and pay any benefits received

back to Centerpulse.  May SOF ¶ 82 and SEC Resp. at 22.  The benefits under the settlement

agreement would not only include a $206,000 standard payment, but also payments from the

EIF.  May SOF ¶¶ 81, 83 and SEC Resp. at 22-23.  In January 2003, May calculated that the 31

plaintiffs opting back into the class would each pay back approximately $175,000 to the EIF, and

hence credited $5.4 million to the recall reserve.  May SOF ¶¶ 88-89 and SEC Resp. at 23-24.

According to May, he claimed the EIF credit based on advice from Brad Honnold, the attorney

handling the settlements with the opt-out patients.  <u>See</u> May Mem. at 24.  May also points out

that PwC approved the treatment of the EIF credit on February 11, 2003.  <u>See</u> May Mem. App. at

Tab 42.

     The SEC counters that neither Honnold nor PwC provided the rationale for May's

actions.  Instead, the SEC argues, May claimed the $5.4 million offset only after Kamber and

Husi strongly reacted to May's proposal that the recall reserve be increased by $78 million.  As

with the miscounts issue, the SEC relies on the email exchange from late January 2003 between

May, Kamber, and Husi.  In a January 23, 2003 email, May proposed increasing the recall

reserve, and the next day he proposed an even greater increase of $78 million.  Within a few

hours, Kamber responded "This is crazy!!  We will get killed with this."  SEC App. at A896.

That same day, Husi emailed May that "[t]he goal must be to substantially reduce the accruals

proposed by you. . . .  We must together find an argumentation to get there."  <u>Id.</u> at A900.  May

responded that he would do his best, but reminded Husi that "I am not a miracle worker."  <u>Id.</u>

Within three days, May suggested several ways to "leave the recall reserve at the original booked

amount of $873.4 [million]," including claiming the $5.4 million EIF refund.  <u>Id.</u> at A905.

     Here, too, a genuine issue of material fact precludes summary judgment as to a portion of

this issue.  Reasonable fact-finders could differ as to whether May claimed the EIF refund

because of improper pressure from Kamber and Husi or because of advice from Honnold.  If a reasonable fact-finder determines that May claimed the refund before it was probable and reasonably estimable, then the recall reserve was understated by $5.4 million and constitutes a violation of the Antifraud Provisions.  If the fact-finder concludes, however, that the EIF refunds were properly claimed because of advice from counsel, then claiming the EIF credit does not constitute a violation of GAAP and the Antifraud Provisions.

A fact-finder could only determine that May was a primary violator with regard to the February 18, 2003 representation letter, which he signed.  As discussed in analyzing the miscounts issue, no reasonable fact-finder could conclude that May <u>caused</u> misstatements to be made in the Form 20-F; at most, he aided and abetted those misstatements.  Accordingly, May's motion for summary judgment will be granted in part and denied in part on this claim.

The SEC also argues that May violated the Books & Records and False Statements Provisions because of the EIF credit.  <u>See</u> SEC Opp'n at 33, 34.  The SEC claims that May falsely represented that the recall reserve was adequate by claiming the EIF credit.  As described above, there is a genuine issue of material fact as to whether Centerpulse was permitted to claim the EIF credit when it did.  Summary judgment, then, will be denied on these claims.

## IV.  Reprocessed Revisions Issue

According to the SEC, Centerpulse's failure to increase the recall reserve by $8.3 million because of a higher estimate of the number of reprocessed revision surgeries violated GAAP. Again, the relevant accounting standard requires loss contingencies to be accrued when a liability becomes probable and is reasonably estimable.  <u>See</u> FAS 5(8).  Maximum liability need not be accrued -- instead, a company may book a liability at the low end of the range of exposure.  <u>See</u> FAS 5(10); Deposition of Robert J. Sack at 59:18-23 (attached as May Mem.

App. Tab 54).

On February 18, 2003, May and others signed a representation letter to PwC in which they estimated 109 reprocessed revisions.  See May Mem. App. Tab 9.  Two days later, Centerpulse made a presentation to Smith & Nephew, a company considering purchasing Centerpulse, entitled "Litigation Overview."  See SEC App. at A1012.  The final version of the Smith & Nephew presentation estimated 164 reprocessed revisions.  Id. at A1024.  Centerpulse may have revised that number downwards at the actual presentation -- May, who listened via videoconference, appears to have heard an estimate of 148 reprocessed revisions.[11]  On February 21, 2003, the day after the Smith & Nephew presentation, May emailed Kamber and others and expressed concerns about the recall reserve.  If the 148 estimate was correct, May stated, then "I estimate that we are under-reserved by $8.3 million."  See SEC App. at A1434.  He explained that the then-current reserve was based on the previous estimate of 109.  Id.

May now explains that the concerns he voiced in his February 21 email (and in a subsequent email the following day) cannot be interpreted to mean that the recall reserve was in fact understated by $8.3 million at the time.  See May Mem. at 25-27.  May points to Wise's testimony, who explained that "we were trying to project a reasonable worst-case number for reprocessed revisions, not a number that we felt at that point in time was reasonably likely to occur."  See Wise Dep. at 106:3-8.  Wise testified that May apparently "got the impression from . . . that presentation that we put up 148 as the minimum number of expected reprocessed revisions, and that would be a mischaracterization of what we presented.  I don't know where the 148 came from, but it was not presented as the low end."  Id. at 105:13-19.  The SEC does not

---

[11] This discrepancy is of no import here, because the SEC bases its claim on the 148 estimate, not the 164 estimate.

dispute that GAAP permits reserves to be booked at the low end of the range of exposure. Hence, because the Smith & Nephew presentation provided conservative, not low-end, estimates, Centerpulse was not required to increase the recall reserve based on those estimates.

The SEC takes issue with the characterization of the Smith & Nephew presentation as a "worst-case scenario."  <u>See</u> SEC Opp'n at 27.  The SEC makes two arguments, but neither creates a genuine issue of material fact.  First, the SEC points out that the final version of the Smith & Nephew presentation described the estimates as "reasonable and conservative" whereas previous drafts had described the estimates as a "worst-case scenario."  <u>See id.</u>  The SEC argues that based on this change, "one thing the fact-finder can be certain of is that the company did not mean for the presentation to be a worst case analysis."  <u>Id.</u>  When confronted with the "reasonable and conservative" language at his deposition, Wise explained that "I think conservative is a fair way to characterize worst case. . . .  [M]aybe worst case is worse than conservative, but the connotation is the same.  It is what you could reasonably expect to get if things don't go . . . in the best possible way for you."  Wise Dep. at 212:22-213:3.  But the SEC's argument misses the point.  The SEC's own expert testified that GAAP permits reserves to be booked at the low end of exposure.  Sack Dep. at 59:18-23.   Whether the presentation provided a "conservative" estimate or a "worst-case" one, Centerpulse was only required to increase the recall reserve if the low end of exposure had increased.  There is no suggestion that the low end of exposure increased because of the Smith & Nephew presentation.

The SEC's second argument is that "it did not make sense for Centerpulse to overstate its recall liability in the presentation" because "Centerpulse wanted the acquisition to go through." SEC Opp'n at 27.  But, as Wise pointed out in his deposition, the presentation was made to rebut Smith & Nephew's own estimates as to potential liability, which were far higher than

Centerpulse's estimates.  Wise Dep. at 101:6-10.  Wise explained that Centerpulse was "trying to bring some level of reasonableness" to Smith & Nephew's estimates.  Id.  This explanation rebuts the SEC's argument that presentation of a conservative estimate would be nonsensical, and the SEC provides no reason for the Court -- or a fact-finder -- to discount Wise's explanation.

Hence, as to the reprocessed revisions issue, there is no genuine issue of material fact and no reasonable fact-finder could determine that Centerpulse violated GAAP by not increasing the recall reserve by $8.3 million.  Accordingly, summary judgment will be granted in favor of May as to the SEC's claims regarding the reprocessed revisions issue.

## CONCLUSION

May's motion will be granted in part and denied in part.  It will be granted as to all claims relating to the reprocessed revisions issue and as to all Spinetech-related claims.  On the Scruggs issue, the motion will be granted as to the SEC's claim that May was a primary violator of the Antifraud Provisions, but it will be denied as to all other claims.  On both the miscounts issue and the EIF credit issue, summary judgment will be denied as to all claims related to the February 18, 2003 representation letter.  With regard to the Form 20-F, summary judgment will be granted as to the primary violator claims but will be denied as to all other claims.  A separate order accompanies this opinion.

_____/s/ John D. Bates_____
JOHN D. BATES
United States District Judge

Date: August 28, 2009